## KREMENS, HOSPITAL DIRECTOR, ET AL. v. BARTLEY ET AL.

No. 75–1064.   Argued December 1, 1976—Decided May 16, 1977

*Norman J. Watkins,* Deputy Attorney General of Pennsylvania, argued the cause for appellants. With him on the briefs were *Robert P. Kane,* Attorney General, *Barry A. Roth,* Assistant Attorney General, and *J. Justin Blewitt, Jr.,* Deputy Attorney General.

*David Ferleger* argued the cause and filed a brief for appellees.

*Bernard G. Segal* argued the cause for the Supreme Court of Pennsylvania as *amicus curiae.* With him on the brief was *James D. Crawford.*\*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

# I

Appellees Bartley, Gentile, Levine, Mathews, and Weand were the named plaintiffs in a complaint challenging the constitutionality of Pennsylvania statutes governing the voluntary admission and voluntary commitment to Pennsylvania mental health institutions of persons 18 years of age or younger. The named plaintiffs alleged that they were then being held at Haverford State Hospital, a Pennsylvania mental health facility, and that they had been admitted or committed pursuant to the challenged provisions of the

---

\*Briefs of *amici curiae* urging reversal were filed by *Curt T. Schneider,* Attorney General, and *Bruce A. Roby* for the State of Kansas; and by *Bruce A. Miller* for the Michigan Association of Emotionally Disturbed Children.

Briefs of *amici curiae* urging affirmance were filed by *Lawrence E. Walsh, John H. Lashly,* and *Michael S. Lottman* for the American Bar Assn.; by *Stanley C. Van Ness* for the Department of the Public Advocate, Division of Mental Health Advocacy of New Jersey; by *Gary J. Kolb* for Michigan Legal Services et al.; and by *Robert L. Walker* and *Peter B. Sandmann* for the Youth Law Center.

Briefs of *amici curiae* were filed by *Solicitor General Bork, Assistant Attorney General Pottinger, Brian K. Landsberg,* and *Judith E. Wolf* for the United States; by *Patricia M. Wald* and *Paul R. Friedman* for the American Orthopsychiatric Assn. et al.; by *Allen R. Snyder* for the American Psychiatric Assn. et al.; by *Bayard M. Graf, Harold E. Kohn, Samuel E. Klein,* and *Frank E. Hahn, Jr.,* for the Devereux Foundation et al.; by *Michael A. Wolff* for the National Juvenile Law Center; and by *Stephen P. Berzon, Marian Wright Edelman, Stephen Wizner,* and *Joseph J. Levin, Jr.,* for the plaintiffs in *Poe et al.* v. *Mathews et al.* and other cases.

Pennsylvania Mental Health and Mental Retardation Act of 1966, Pa. Stat. Ann., tit. 50, § 4101 *et seq.* (1969). Various state and hospital officials were named as defendants.[1]

Plaintiffs sought to vindicate not only their own constitutional rights, but also sought to represent a class consisting of

"all persons under eighteen years of age who have been, are, or, may be admitted or committed to Haverford State Hospital and all other state mental health facilities under the challenged provisions of the state statute." App. 10a–11a (complaint ¶ 7).

A three-judge United States District Court for the Eastern District of Pennsylvania struck down the statutes as violative of the Due Process Clause of the Fourteenth Amendment. 402 F. Supp. 1039 (1975). The court also entered a broad order requiring the implementation of detailed procedural protections for those admitted under the Pennsylvania statutes. On December 15, 1975, this Court granted appellants' application for a stay of the judgment of the District Court. On March 22, 1976, we noted probable jurisdiction. 424 U. S. 964.

In general, the 1966 Act, which has been superseded to a significant degree, provides for three types of admission to a mental health facility for examination, treatment, and care: voluntary admission or commitment (§§ 402 and 403), emergency commitment (§ 405), and civil court commitment (§ 406). At issue here was the constitutionality of the voluntary admission and commitment statutes,[2] §§ 402 and 403,

---

[1] Haverford State Hospital was initially named as a defendant but was dismissed by mutual agreement. 402 F. Supp. 1039, 1043 n. 6 (ED Pa. 1975).

[2] The principal distinction between the sections is that a voluntary commitment is not to exceed 30 days, with successive periods not to exceed 30 days each, as long as care or observation is necessary. There is no time limitation following a voluntary admission to a facility. See *id.,* at 1054–1055, n. 3 (dissenting opinion). See also n. 4, *infra.* There has been no distinction between the two sections for purposes of this lawsuit. Hence, unless otherwise indicated, we shall use the words "admitted" and "committed" interchangeably.

as those statutes regulate the admission of persons 18 years of age or younger. The statutes [3] provide that juveniles may be admitted upon the application of a parent, guardian,

[3] The statutes provide:

§ 402. "Voluntary admission; application, examination and acceptance; duration of admission

"(a) Application for voluntary admission to a facility for examination, treatment and care may be made by:

"(1) Any person over eighteen years of age.

"(2) A parent, guardian or individual standing in loco parentis to the person to be admitted, if such person is eighteen years of age or younger.

"(b) When an application is made, the director of the facility shall cause an examination to be made. If it is determined that the person named in the application is in need of care or observation, he may be admitted.

"(c) Except where application for admission has been made under the provisions of section 402 (a) (2) and the person admitted is still eighteen years of age or younger, any person voluntarily admitted shall be free to withdraw at any time. Where application has been made under the provisions of section 402 (a) (2), only the applicant or his successor shall be free to withdraw the admitted person so long as the admitted person is eighteen years of age or younger.

"(d) Each admission under the provisions of this section shall be reviewed at least annually by a committee, appointed by the director from the professional staff of the facility wherein the person is admitted, to determine whether continued care is necessary. Said committee shall make written recommendations to the director which shall be filed at the facility and be open to inspection and review by the department and such other persons as the secretary by regulation may permit.

"Where the admission is under the provisions of section 402 (a) (2), the person admitted shall be informed at least each sixty days of the voluntary nature of his status at the facility." Pa. Stat. Ann., tit. 50, § 4402 (1969) (footnote omitted).

§ 403. "Voluntary commitment; application, examination and acceptance; duration of commitment

"(a) Application for voluntary commitment to a facility for examination, treatment and care may be made by:

"(1) Any person over eighteen years of age.

"(2) A parent, guardian or individual standing in loco parentis to the person to be admitted, if such person is eighteen years of age or younger.

"(b) The application shall be in writing, signed by the applicant in the

124

or individual standing *in loco parentis* and that, unlike adults, the admitted person is free to withdraw only with the consent of the parent or guardian admitting him.[4]

There have been two major changes in the Pennsylvania statutory scheme that have materially affected the rights of juveniles: the promulgation of regulations under the 1966 Act, and the enactment of the Mental Health Procedures Act in 1976. At the time the complaint was filed, the 1966 Act

presence of at least one witness. When an application is made, the director of the facility shall cause an examination to be made. If it is determined that the person named in the application is in need of care or observation, he shall be committed for a period not to exceed thirty days. Successive applications for continued voluntary commitment may be made for successive periods not to exceed thirty days each, so long as care or observation is necessary.

"(c) No person voluntarily committed shall be detained for more than ten days after he has given written notice to the director of his intention or desire to leave the facility, or after the applicant or his successor has given written notice of intention or desire to remove the detained person.

"(d) Each commitment under the provisions of this section shall be reviewed at least annually by a committee, appointed by the director from the professional staff of the facility wherein the person is cared for, to determine whether continued care and commitment is necessary. Said committee shall make written recommendations to the director which shall be filed at the facility and be open to inspection and review by the department and such other persons as the secretary by regulation shall permit.

"Where the commitment is under the provisions of section 403 (a) (2), the person committed shall be informed at least each sixty days of the voluntary nature of his status at the facility." Pa. Stat. Ann., tit. 50, § 4403 (1969) (footnote omitted).

[4] With respect to those voluntarily admitted, the 1966 Act explicitly distinguishes between adults, who are free to withdraw at any time, and those 18 and younger, who may withdraw only with the consent of the admitting parent or guardian. § 402 (c). However, § 403 (c), relating to withdrawal after voluntary commitment, does not explicitly make an age distinction, and, on its face, would allow either the person committed or the applicant (*i. e.*, the parent or guardian) to effect the withdrawal. However, neither the court below nor the parties have read the statute as containing this distinction. *E. g.*, Brief for Appellants 25.

made little or no distinction between older and younger juveniles. Each of the named plaintiffs was at that time between 15 and 18 years of age. After the commencement of this action, but *before* class certification or decision on the merits by the District Court, the Pennsylvania Department of Public Welfare promulgated regulations which substantially increased the procedural safeguards afforded to minors 13 years of age or older. The regulations, promulgated pursuant to statutory authority,[5] became effective September 1, 1973. The major impact of the regulations[6] upon this litigation stems from the fact that the regulations accord significant procedural protections to those 13 and older, but not to those less than 13. The older juveniles are given notification of their rights, the telephone number of counsel, and the right to institute a § 406 involuntary commitment proceeding in court within two business days. Under § 406,[7] a judicial hearing is held after notice to the parties. The younger juveniles are not given the right to a hearing and are still remitted to relying upon the admitting parent or guardian.

Although the regulations sharply differentiate between juveniles of less than 13 years of age and those 13 to 18, on April 29, 1974, the District Court nonetheless certified the following class to be represented by the plaintiffs:

> "This action shall be maintained as a class action under Rule 23 (b)(1) and (2) of the Federal Rules of Civil Procedure on behalf of the class comprised of all persons eighteen years of age or younger who have been, are or may be admitted or committed to mental health facilities in Pennsylvania pursuant to the challenged

---

[5] § 201 (2) of the 1966 Act.

[6] Relevant portions of the regulations are set forth in the District Court's opinion. 402 F. Supp., at 1042–1043, n. 5.

[7] Section 406 is the statute that provides for the hearing procedures to be used in an *involuntary* civil court commitment. Pa. Stat. Ann., tit. 50, § 4406 (1969).

provisions of the state mental health law (i. e., 50 P. S. §§ 4402 and 4403). This definition of the class is without prejudice to the possibility that it may be amended or altered before the decision on the merits herein." App. 270a.

On July 9, 1976, after the decision below and after this Court had noted probable jurisdiction, Pennsylvania enacted a new statute substantially altering its voluntary admission procedures. Mental Health Procedures Act, Pa. Act No. 143. The new Act completely repeals the provisions declared unconstitutional below except insofar as they relate to mentally retarded persons. § 502. Under the new Act, any person 14 years of age or over may voluntarily admit himself, but his parents may not do so; those 14 to 18 who were subject to commitment by their parents under the 1966 Act are treated essentially as adults under the new Act. § 201.[8] Under the new Act children 13 and younger may still be admitted for treatment by a parent, guardian, or person standing *in loco parentis*. *Ibid*. Those 14 and over may withdraw from voluntary treatment "at any time by giving written notice." § 206 (a).[9] Those under 14 may be released by request of the parent; in addition, "any responsible party" may petition the Juvenile Division of the Court of Common

---

[8] Section 201 provides:

"Any person 14 years of age or over who believes that he is in need of treatment and substantially understands the nature of voluntary commitment may submit himself to examination and treatment under this act, provided that the decision to do so is made voluntarily. A parent, guardian, or person standing in loco parentis to a child less than 14 years of age may subject such child to examination and treatment under this act, and in so doing shall be deemed to be acting for the child. Except as otherwise authorized in this act, all of the provisions of this act governing examination and treatment shall apply."

[9] Section 206 provides:

"(a) A person in voluntary inpatient treatment may withdraw at any time by giving written notice unless, as stated in section 203, he has

Pleas to request withdrawal of the child or modification of his treatment. § 206 (b).

Because we have concluded that the claims of the named appellees are mooted by the new Act, and that the claims of the unnamed members of the class are not properly presented for review, we do not dwell at any length upon the statutory scheme for voluntary commitment in Pennsylvania or upon the rationale of the District Court's holding that the 1966 Act and regulations did not satisfy due process.

## II

This case presents important constitutional issues—issues that were briefed and argued before this Court. However, for reasons hereafter discussed, we conclude that the claims of the named appellees are mooted by the new Act and

agreed in writing at the time of his admission that his release can be delayed following such notice for a period to be specified in the agreement, provided that such period shall not exceed 72 hours.

"(b) If the person is under the age of 14, his parent, legal guardian, or person standing in loco parentis may effect his release. If any responsible party believes that it would be in the best interest of a person under 14 years of age in voluntary treatment to be withdrawn therefrom or afforded treatment constituting a less restrictive alternative, such party may file a petition in the Juvenile Division of the court of common pleas for the county in which the person under 14 years of age resides, requesting a withdrawal from or modification of treatment. The court shall promptly appoint an attorney for such minor person and schedule a hearing to determine what inpatient treatment, if any, is in the minor's best interest. The hearing shall be held within ten days of receipt of the petition, unless continued upon the request of the attorney for such minor. The hearing shall be conducted in accordance with the rules governing other Juvenile Court proceedings.

"(c) Nothing in this act shall be construed to require a facility to continue inpatient treatment where the director of the facility determines such treatment is not medically indicated. Any dispute between a facility and a county administrator as to the medical necessity for voluntary inpatient treatment of a person shall be decided by the Commissioner of Mental Health or his designate." (Footnote omitted.)

decline to adjudicate the claims of the class certified by the District Court. That class has been fragmented by the enactment of the new Act and the promulgation of the regulations.

Constitutional adjudication being a matter of "great gravity and delicacy," see *Ashwander* v. *TVA,* 297 U. S. 288, 345 (1936) (Brandeis, J., concurring), we base our refusal to pass on the merits on "the policy rules often invoked by the Court 'to avoid passing prematurely on constitutional questions. Because ·[such] rules operate in "cases confessedly within [the Court's] jurisdiction" . . . they find their source in policy, rather than purely constitutional, considerations.' " *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747, 756 n. 8 (1976).

## A

At the time the complaint was filed, each of the named plaintiffs was older than 14, and insofar as the record indicates, mentally ill.[10] The essence of their position was that, as matters stood at that time, a juvenile 18 or younger could be "voluntarily" admitted upon application of his parent, over the objection of the juvenile himself. Thus, appellees urged in their complaint that the Due Process Clause required that they be accorded the right to a hearing, as well as other procedural protections, to ensure the validity of the commitment. App. 21a–22a (complaint ¶ 46).

The fact that the Act was passed after the decision below does not save the named appellees' claims from mootness. There must be a live case or controversy before this Court,

---

[10] The following notations are found in various medical records and evaluations in the record: (a) appellee Bartley, "Admission Note: Organic Brain Syndrome with epilepsy" (App. 137a); (b) appellee Gentile, "Schizophrenia" (*id.,* at 145a); appellee Levine, "functioning within the average range of intelligence" (*id.,* at 167a); appellee Weand, "dull normal range of intelligence" (*id.,* at 169a); appellee Mathews, "functioning on a lower average range of intelligence, giving evidence of bright, normal and even superior learning capacities" (*id.,* at 175a).

*Sosna* v. *Iowa,* 419 U. S. 393, 402 (1975), and we apply the law as it is now, not as it stood below. *Fusari* v. *Steinberg,* 419 U. S. 379 (1975); *Sosna* v. *Iowa, supra.* Thus the enactment of the new statute [11] clearly moots the claims of the named appellees, and all others 14 or older and mentally ill.

These concerns were eradicated with the passage of the new Act, which applied immediately to all persons receiving voluntary treatment. § 501. The Act, in essence, treats mentally ill juveniles 14 and older as adults. They may voluntarily commit themselves, but their parents may not do so, § 201, and one receiving voluntary treatment may withdraw at any time by giving written notice. § 206. With respect to the named appellees, the Act completely repealed and replaced the statutes challenged below, and obviated their demand for a hearing, and other procedural protections, since the named appellees had total freedom to leave the hospital, and could not be forced to return absent their consent. After the passage of the Act, in no sense were the named appellees "detained and incarcerated involuntarily in mental hospitals," as they had alleged in the complaint, App. 21a.

### B

If the only appellees before us were the named appellees, the mootness of the case with respect to them would require that we vacate the judgment of the District Court with instructions to dismiss their complaint. *United States* v. *Munsingwear,* 340 U. S. 36 (1950). But as we have previously indicated, the District Court certified, pursuant to Fed. Rule Civ. Proc. 23, the class described *supra,* at 125–126.

In particular types of class actions this Court has held that the presence of a properly certified class may provide an added dimension to our Art. III analysis, and that the moot-

---

[11] Given our view that the Act moots the claims of the named appellees, we need not address the issue of whether the promulgation of the new regulations had previously mooted their claims.

ness of the named plaintiffs' claims does not "inexorably" require dismissal of the action. *Sosna, supra,* at 399–401. See also *Franks* v. *Bowman Transportation, Inc., supra,* at 752–757; *Gerstein* v. *Pugh,* 420 U. S. 103, 110–111, n. 11 (1975). But we have never adopted a flat rule that the mere fact of certification of a class by a district court was sufficient to require us to decide the merits of the claims of unnamed class members when those of the named parties had become moot. Cf. *Sosna, supra,* at 402. Here, the promulgation of the regulations materially changed, prior to class certification, the controverted issues with respect to a large number of unnamed plaintiffs; prior to decision by this Court, the controverted issues pertaining to even more unnamed plaintiffs have been affected by the passage of the 1976 Act. We do not think that the fragmented residual of the class originally certified by the District Court may be treated as were the classes in *Sosna* and *Franks.*

There is an obvious lack of homogeneity among those unnamed members of the class originally certified by the District Court. Analysis of the current status of the various subgroups reveals a bewildering lineup of permutations and combinations. As we parse it, the claims of those 14 and older and mentally ill are moot. They have received by statute all that they claimed under the Constitution. Those 14 and older and mentally retarded are subject to the 1966 Act, struck down by the District Court, but are afforded the protections of the regulations. Their claims are not wholly mooted, but are satisfied in many respects by the regulations. Those 13 and mentally ill are subject to the admissions procedures of the new Act, arguably supplemented by the procedural protection of the regulations. The status of their claims is unclear. Those 13 and mentally retarded are subject to the 1966 Act and the regulations promulgated thereunder. Their claims are satisfied in many respects. Those younger than 13 and mentally ill are unaided by the

regulations and are subject to the admissions procedures of the 1976 Act, the constitutional effect of which has not been reviewed by the District Court. Those younger than 13 and mentally retarded are subject to the 1966 Act, unaffected by the regulations. This latter group is thus the *only* group whose status has not changed materially since the outset of the litigation. These fragmented subclasses are represented by named plaintiffs whose constitutional claims are moot, and it is the attorneys for these named plaintiffs who have conducted the litigation in the District Court and in this Court.[12]

The factors which we have just described make the class aspect of this litigation a far cry indeed from that aspect of the litigation in *Sosna* and in *Franks,* where we adjudicated the merits of the class claims notwithstanding the mootness of the claims of the named parties. In *Sosna,* the named plaintiff had by the time the litigation reached this Court fulfilled the residency requirement which she was challenging, but the class described in the District Court's certification remained exactly the same. In that case, mootness was due to the inexorable passage of time, rather than to any change in the law. In *Franks,* a Title VII discrimination lawsuit, the named plaintiff had been subsequently discharged for a nondiscriminatory reason, and therefore before this Court that plaintiff no longer had a controversy with his employer similar to those of the unnamed members of the class. But

---

[12] MR. JUSTICE BRENNAN suggests that none of this is relevant to our adjudication of the case. *Post,* at 140–142. Implicit in this suggestion is the conclusion that in the present posture of this case certification of a class represented by these named plaintiffs would be acceptable. This approach disregards the prerequisites to class actions contained in Fed. Rule Civ. Proc. 23 (a), see n. 14, *infra,* and pushed to its logical conclusions would do away with the standing requirement of Art. III. See, *e. g., Bailey* v. *Patterson,* 369 U. S. 31, 33 (1962) (parties may not "represent a class of whom they are not a part"); *Schlesinger* v. *Reservists to Stop the War,* 418 U. S. 208, 216 (1974) (class representative must "possess the same interest and suffer the same injury" as members of class).

the metes and bounds of each of those classes remained the same; the named plaintiff was simply no longer within them.

Here, by contrast, the metes and bounds of the class certified by the District Court have been carved up by two changes in the law. In *Sosna* and *Franks*, the named plaintiffs had simply "left" the class, but the class remained substantially unaltered. In both of those cases, the named plaintiff's mootness was not related to any factor also affecting the unnamed members of the class. In this case, however, the class has been both truncated and compartmentalized by legislative action; this intervening legislation has rendered moot not only the claims of the named plaintiffs but also the claims of a large number of unnamed plaintiffs.[13] The legislation, coupled with the regulations, has in a word materially changed the status of those included within the class description.

For all of the foregoing reasons, we have the gravest doubts whether the class, as presently constituted, comports with the requirements of Fed. Rule Civ. Proc. 23 (a).[14] And it is

---

[13] MR. JUSTICE BRENNAN, *post*, at 142, seeks to minimize the extent of the changes in the law by asserting that only 20% of the plaintiff class is affected by the new Act. Even if this assertion were undisputed, it would not affect our disposition of the case. But we have no way to test the reliability of that figure. Before the new Act was passed, the distinction between mentally ill and mentally retarded was largely irrelevant for admissions purposes; hence the District Court made no findings with respect to the proportion of the class in each category, and the dissent does not indicate any support in the record for this figure, which first appears in the Reply Brief for Appellants 1 n. 2. Since this information was supplied by a party seeking a determination on the merits, it cannot be treated as a form of "admission against interest" by a litigant on appeal. In addition, the suggestion that 80% of the class remains *in statu quo ante* completely overlooks the substantial changes wrought by the regulations, which classified on the basis of age, rather than on the basis of mental illness or mental retardation.

[14] Rule 23 (a) provides:

"(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable,

only a "properly certified" class that may succeed to the adversary position of a named representative whose claim becomes moot. *Indianapolis School Comm'rs* v. *Jacobs,* 420 U. S. 128 (1975).

In addition to the differences to which we have already adverted, the issues presented by these appellees, unlike that presented by the appellant in *Sosna, supra,* are not "capable of repetition, yet evading review." In the latter case there is a significant benefit in according the class representative the opportunity to litigate on behalf of the class, since otherwise there may well never be a definitive resolution of the constitutional claim on the merits by this Court. We stated in *Franks* that "[g]iven a properly certified class action, . . . mootness turns on whether, in the specific circumstances of the given case at the time it is before this Court, an adversary relationship sufficient to fulfill this function exists." 424 U. S., at 755–756. We noted that the "evading review" element was one factor to be considered in evaluating the adequacy of the adversary relationship in this Court. *Id.,* at 756 n. 8. In this case, not only is the issue one that will not evade review, but the existence of a "properly certified class action" is dubious, and the initial shortcomings in the certification have multiplied. See *Indianapolis School Comm'rs* v. *Jacobs, supra.*

In sum, none of the critical factors that might require us to adjudicate the claims of a class after mootness of the named plaintiff's claims are present here. We are dealing with important constitutional issues on the merits, issues which are not apt to evade review, in the context of mooted claims on the part of all of the named parties and a certified class which, whatever the merits of its original

(2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

certification by the District Court, has been fragmented by the enactment of legislation since that certification. While there are "live" disputes between unnamed members of portions of the class certified by the District Court, on the one hand, and appellants, on the other, these disputes are so unfocused as to make informed resolution of them almost impossible. Cf. *Fusari* v. *Steinberg,* 419 U. S. 379 (1976). We accordingly decline to pass on the merits of appellees' constitutional claims.[15]

We conclude that before the "live" claims of the fragmented subclasses remaining in this litigation can be decided on the merits, the case must be remanded to the District Court

---

[15] MR. JUSTICE BRENNAN suggests that our refusal to review the merits of these claims, and our vacation of the District Court's judgment, are simply a confusing and unnecessary exaltation of form over substance. While our refusal to pass on the merits rests on discretionary considerations, we have long heeded such discretionary counsel in constitutional litigation. See *Ashwander* v. *TVA,* 297 U. S. 288, 341 (1936) (Brandeis, J., concurring). The dissent's startling statement that our insistence on plaintiffs with live claims is "purely a matter of form," *post,* at 142, would read into the Constitution a vastly expanded version of Rule 23 while reading Art. III out of the Constitution. The availability of thoroughly prepared attorneys to argue both sides of a constitutional question, and of numerous *amici curiae* ready to assist in the decisional process, even though all of them "stand like greyhounds in the slips, straining upon the start," does not dispense with the requirement that there be a live dispute between "live" parties before we decide such a question.

The dissent, *post,* at 137, attaches great weight to the fact that the State argues that the case is not moot. As we have pointed out in the text, *infra,* at 136, the fact that the parties desire a decision on the merits does not automatically entitle them to receive such a decision. It is not at all unusual for all parties in a case to desire an adjudication on the merits when the alternative is additional litigation; but their desires can be scarcely thought to dictate the result of our inquiry into whether the merits should be reached. The dissent's additional reliance on the "numerous *amici* [who have requested] an authoritative constitutional ruling . . ." *post,* at 140, overlooks the fact that briefs for no fewer than eight of these *amici* argue that the case is moot or suggest that the case be remanded for consideration of the intervening legislation.

for reconsideration of the class definition, exclusion of those whose claims are moot, and substitution of class representatives with live claims.

Because the District Court will confront this task on remand, we think it not amiss to remind that court that it is under the same obligation as we are to "stop, look, and listen" before certifying a class in order to adjudicate constitutional claims. That court, in its original certification, ignored the effect of the regulations promulgated by appellants which made a dramatic distinction between older and younger juveniles,[16] and, according to the District Court, 402 F. Supp., at 1042, accorded the named appellees all of the protections which they sought, save two: the right to a precommitment hearing, and the specification of the time for the postcommitment hearing.

This distinction between older and younger juveniles, recognized by state administrative authorities (and later by the Pennsylvania Legislature in its enactment of the 1976 Act), emphasizes the very possible differences in the interests of the older juveniles and the younger juveniles. Separate counsel for the younger juveniles might well have concluded that it would not have been in the best interest of their clients to press for the requirement of an automatic precommitment hearing, because of the possibility that such a hearing with its propensity to pit parent against child might actually be antithetical to the best interest of the younger juveniles. In the event that these issues are again litigated before the District Court, careful attention must be paid to the differences between mentally ill and mentally re-

---

[16] Upon promulgation of the regulations, the named appellees received, *inter alia,* the right to institute a "section 406" involuntary commitment proceeding in court within two business days. Under § 406, a judicial hearing is held after notice to the parties; counsel is provided for indigents. It is this right to a hearing that was the gravamen of appellees' complaint. App. 21a–23a (complaint ¶ 46).

tarded, and between the young and the very young. It may be that Pennsylvania's experience in implementing the new Act will shed light on these issues.

### III

This disposition is made with full recognition of the importance of the issues, and of our assumption that all parties earnestly seek a decision on the merits. As Mr. Justice Brandeis stated in his famous concurrence in *Ashwander* v. *TVA*, 297 U. S., at 345:

"The fact that it would be convenient for the parties and the public to have promptly decided whether the legislation assailed is valid, cannot justify a departure from these settled rules . . . ."

And, as we have more recently observed in the context of "ripeness":

"All of the parties now urge that the 'conveyance taking' issues are ripe for adjudication. However, because issues of ripeness involve, at least in part, the existence of a live 'Case or Controversy,' we cannot rely upon concessions of the parties and must determine whether the issues are ripe for decision in the 'Case or Controversy' sense. Further, to the extent that questions of ripeness involve the exercise of judicial restraint from unnecessary decision of constitutional issues, the Court must determine whether to exercise that restraint and cannot be bound by the wishes of the parties." *Regional Rail Reorganization Act Cases,* 419 U. S. 102, 138 (1974). (Footnote omitted.)

Our analysis of the questions of mootness and of our ability to adjudicate the claims of the class in this case is consistent with the long-established rule that this Court will not "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Liverpool,*

*N. Y. & P. S. S. Co.* v. *Emigration Comm'rs,* 113 U. S. 33, 39 (1885). The judgment of the District Court is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice Brennan, with whom Mr. Justice Marshall joins, dissenting.

As was true three Terms ago with respect to another sensitive case brought to this Court, I can "find no justification for the Court's straining to rid itself of this dispute." *DeFunis* v. *Odegaard,* 416 U. S. 312, 349 (1974) (Brennan, J., dissenting). "Although the Court should, of course, avoid unnecessary decisions of constitutional questions, we should not transform principles of avoidance of constitutional decisions into devices for sidestepping resolution of difficult cases." *Id.,* at 350.

Pursuant to Fed. Rule Civ. Proc. 23, the District Court, on April 29, 1974, certified appellee class consisting of persons 18 years of age or younger who are or may be committed to state mental facilities under Pennsylvania's Mental Health and Mental Retardation Act of 1966. The State not only did not then oppose the certification, but to this day urges that this Court render a decision on the "important constitutional issues . . . that were briefed and argued before this Court." *Ante,* at 127. Over a score of *amici curiae* organizations and parties similarly joined in presenting their views to us. Ordinarily of course, the defendant's failure to object to a class certification waives any defects not related to the "cases or controversies" requirement of Art. III, cf. *O'Shea* v. *Littleton,* 414 U. S. 488, 494–495 (1974), and would require us to proceed to the merits of the dispute.

The Court pointedly does not suggest that the class definition suffers from constitutionally based jurisdictional deficiencies. Instead, its analysis follows a different route. We

are first told that it is likely[1] that the claims of the named class members are moot. After several pages in which the Court parses decisions like *Sosna* v. *Iowa,* 419 U. S. 393 (1975), and *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747 (1976), for selected clauses and phrases, thereby attempting to distinguish the present case from those earlier decisions where class claims were allowed to reach decision, the opinion ultimately concludes that in their present posture the legal claims of the class members "are so unfocused as to make informed resolution of them almost impossible," *ante,* at 134, citing *Fusari* v. *Steinberg,* 419 U. S. 379 (1975). Accordingly, the Court "decline[s] to pass on the merits of appellees' constitutional claims," *ante,* at 134, and remands to the District Court for clarification of the class certification.

What does all this mean? Most importantly, the Court's class-action analysis must be placed in proper perspective, for it is obvious that the Court's extended discussion of *Sosna, Franks,* and like cases is a mere camouflage of dicta bearing no relationship to the disposition of this case. Those earlier cases merely recognized the continued existence of Art. III jurisdiction notwithstanding the subsequent mootness of the claims of the named parties to a class action. They said nothing about this Court's discretionary authority to remand a class claim or any other claim to the lower courts for needed

---

[1] The statutory modification upon which the Court principally relies for mootness pertains solely to mentally ill children 14 or older, whereas the class consists of all children who are mentally ill and retarded. Since this distinction was irrelevant when the action commenced, the complaint does not inform us whether the named class members, while older than 14, are mentally ill or mentally retarded. Thus, it is accurate for the Court to state that "insofar as the record indicates," all the named children are mentally ill and consequently fall within the purview of the 1976 statutory amendment. *Ante,* at 128. But, since the record barely scratches the surface in this regard, it is possible that some of the children have been committed because of retardation. If so, the Court's supposition that the claims of the named parties are mooted is inaccurate and presumably can be corrected by the District Court on remand.

clarification. Thus, in the present case, the fact that the claims of the named plaintiffs may or may not be mooted, *ante,* at 128–129, is irrelevant, for, if the condition of the record so requires, a remand to clarify matters necessary to permit proper consideration of the issues in this appeal would be warranted regardless of whether the named parties remained in the case. Similarly, the Court's various suggestions that these named plaintiffs "left" the class in a manner distinguishable from those in *Sosna* and *Franks, ante,* at 132, and that the issues presented herein are "not capable of repetition, yet evading review," *ante,* at 133, are without meaning. This Court's power to remand cases as in *Fusari* v. *Steinberg* is in no way dependent on these factors, and is not foreclosed by the existence of Art. III jurisdiction as found in *Franks, Sosna,* and their progeny.

Indeed, it is clear that for all the extraneous discussion of *Sosna* and *Franks,* the decision today follows those cases, for it recognizes that an Art. III "case or controversy" persists in this instance notwithstanding the apparent mootness of the claims of named plaintiffs, and, therefore, confirms that our jurisdiction is constitutionally viable. Otherwise, of course, the Court could not, as it does today, voluntarily "decline" to pass on the merits of the suit, *ante,* at 134, but rather would be *compelled* to avoid any such decision. While, as shall be seen, I disagree that the modification of Pennsylvania law warrants even a clarifying remand in this instance, I think it particularly unwise to hide a purely discretionary decision behind the language of Art. III jurisdiction. After all, the action actually taken today by the Court—a remand for consideration in light of intervening law—is regularly ordered in one or two short paragraphs without such fanfare or gratuitous discussion. See, *e. g., Philadelphia* v. *New Jersey,* 430 U. S. 141 (1977); cf. *Cook* v. *Hudson,* 429 U. S. 165 (1976).

I do not express this objection to the Court's opinion due to a concern for craft alone. Jurisdictional and procedural mat-

ters regularly dealt with by the Court often involve complex and esoteric concepts. An opinion that is likely to lead to misapplication of these principles will cost litigants dearly and will needlessly consume the time of lower courts in attempting to decipher and construe our commands. Consequently, I have frequently voiced my concern that the recent Art. III jurisprudence of this Court in such areas as mootness and standing is creating an obstacle course of confusing standardless rules to be fathomed by courts and litigants, see, e. g., *Warth* v. *Seldin*, 422 U. S. 490, 519–530 (1975) (BRENNAN, J., dissenting); *DeFunis* v. *Odegaard*, 416 U. S., at 348–350 (BRENNAN, J., dissenting), without functionally aiding in the clear, adverse presentation of the constitutional questions presented. As written, today's opinion can only further stir up the jurisdictional stew and frustrate the efforts of litigants who legitimately seek access to the courts for guidance on the content of fundamental constitutional rights.

In this very case, for example, we deny to the parties and to numerous *amici* intervenors an authoritative constitutional ruling for a reason that at best has only surface plausibility. In truth, the Court's purported concern for the "lack of homogeneity" among the children in the class is meaningless in the context of this appeal. The District Court's judgment established and applied a minimum threshold of due process rights available across the board to all children who are committed to mental facilities by their parents pursuant to Pennsylvania law. The core of the mandated rights, essentially the nonwaivable appointment of counsel for every child and the convening of commitment hearings within specified time periods,[2] applies equally to all Pennsylvania children who are subject to parental commitment. In reviewing the propriety of these

---

[2] In brief, the District Court mandated a probable-cause hearing within 72 hours of the initial detention followed by a complete postcommitment hearing within two weeks thereafter. 402 F. Supp. 1039, 1049 (ED Pa. 1975).

threshold constitutional requirements, our inquiry is not to any meaningful extent affected by the intervening change in Pennsylvania law.[3]  Indeed, we are informed by Pennsylvania officials that the 1976 amendment, by abolishing parental commitment of mentally ill children over 14, merely serves to eliminate 20% of the members of the certified class from the lawsuit.  Reply Brief for Appellants 1.  The amendment, however, bears no relationship whatever to the District Court's judgment insofar as it pertains to the remaining 80% of the class—that is, to those children who can still be committed by their parents.[4]  The Commonwealth of Pennsylvania itself

[3] The September 1, 1973, regulations, on which the Court additionally places some reliance, are even less relevant to the proper disposition of this case.  Under these regulations, the procedural rights of juveniles 13 or older underwent change following commencement of this suit.  These older juveniles now must be informed of their rights within 24 hours of commitment and must be given the telephone number of an attorney.  Should the retarded or mentally ill child be capable and willing to take the initiative, he may object to this commitment, contact his lawyer, and request a hearing.  The hospital then can file an involuntary commitment petition, whereby the child remains in the institution pending the hearing on his commitment; the regulations fix no time period in which this hearing must be held.  In its consideration of this case, the District Court was fully aware of these regulations, but concluded that they do not resolve the constitutional infirmities that it found to inhere in Pennsylvania's statutory scheme.  *Id.*, at 1042–1043, n. 5.  In particular, the regulations fall far short of satisfying the lower court's judgment in its failure to guarantee to every child the nonwaivable guidance of an attorney and a prompt commitment hearing within a specified time period.  For this reason, the Court's concern that the class is subdivided into "a bewildering lineup of permutations and combinations," *ante*, at 130, actually is of no constitutional significance to the decision of this suit.  For even taking the regulations into account, all the children who can be committed by their parents continue to be held pursuant to procedures as to which plaintiffs complain, and as to which the District Court concluded, constitutional standards are not satisfied.

[4] The 1976 Act does provide that, with respect to all children, a "responsible party" may step forward and challenge a child's commitment by filing a petition in the juvenile court requesting the appointment

acknowledges that "[o]ver three-fourths of the plaintiff class . . . are subject to the very statutes which the lower court examined, declared unconstitutional, and enjoined." *Id.*, at 3. The Court's disposition of this case, therefore, ensures nothing but an opportunity for the waste of valuable time and energy. At most, the District Court on remand realistically can be expected to confirm that 20% of the children no longer are members of the class, while reaffirming its carefully considered judgment as to the remaining 80%. I do not understand why we do not spare the District Court this purely mechanical task of paring down the class, for nothing would now prevent us from excluding 20% of the children from our consideration of the merits and evaluating the District Court's judgment as it affects the remaining 80%. See, *e. g., Franks* v. *Bowman Transportation Co.*, 424 U. S., at 755–757.

Nor can the Court's action be justified by its order to the District Court that new class representatives with live claims be substituted to press forward with the suit. For, again, in the posture of this case, this is purely a matter of form. *Franks, Sosna,* and *Gerstein* v. *Pugh,* 420 U. S. 103, 110–111, n. 11 (1975), plainly recognize and act upon the premise that, given the representative nature of class actions,[5] the elimination of named plaintiffs ordinarily will have no effect on the "concrete adverseness which sharpens the presentation of issues upon which the Court so largely depends for illumination of difficult constitutional questions."

---

of an attorney and the convening of a hearing. Mental Health Procedures Act § 206 (b) (1976). Given that the most likely "responsible party," the child's parents, are the persons seeking his institutionalization, Pennsylvania itself recognizes that this amounts to "no real change in the law" and to no "additional procedural protections." Reply Brief for Appellants 1–2, n. 3.

[5] See, *e. g., Craig* v. *Boren,* 429 U. S. 190, 194 (1976); *Singleton* v. *Wulff,* 428 U. S. 106, 117–118 (1976) (opinion of BLACKMUN, J.).

*Baker* v. *Carr,* 369 U. S. 186, 204 (1962). Certainly, in this appeal there can be no question of adequate adversity and cogency of argument. Attorneys for the class continue diligently to defend their judgment in behalf of the children who are still within the purview of Pennsylvania's parental commitment law. Pennsylvania equally diligently resists the District Court's judgment and pressures for a controlling constitutional decision. And a vast assortment of *amici curiae* ranging from sister States to virtually all relevant professional organizations have submitted briefs informing our deliberations from every perspective and orientation plausibly relevant to the case. In brief, the Court's assertion of its inability "to make informed resolution of" the issues is, in this instance, pure fancy.

I do not believe that we discharge our institutional duty fairly, or properly service the constituencies who depend on our guidance, by issuing meaningless remands that play wasteful games with litigants and lower courts.[6] Therefore, I re-

---

[6] On several occasions, the Court complains that my position, in characterizing today's action as meaningless and wasteful, fails to give due consideration to the requirements of Art. III and Rule 23. *Ante,* at 131 n. 12, 134 n. 15. This contention is seriously misleading. When the class was duly certified in 1974, both Rule 23 and Art. III were properly complied with—as I agree they must be. The Rule 23 issue is no longer before us, for we cannot, some three years later, *sua sponte* and over the objection of all parties, challenge compliance with a Rule of Civil Procedure, unless, of course, noncompliance or some intervening circumstance serves to undercut our jurisdiction. That is not the case here, however, for both the majority and I are in agreement that no jurisdictional defect is to be found. In sum, therefore, the inquiry applicable to this case is the following: Does this Court properly exercise its discretion through its remand to the District Court when (1) our Art. III jurisdiction is sound, *and* (2) the class plaintiff was properly certified pursuant to Federal Rule, *and* (3) no party objected or today objects to the certification, *and* (4) the class continues to possess live claims and a District Court judgment that are unaffected by any constitutionally relevant changes in state law, *and* (5) the substance of the constitutional con-

spectfully dissent from the Court's disposition of this case. Because the Court does not address the important constitutional questions presented, I too shall defer the expression of my views, pending the Court's inevitable review of those questions in a later case.

---

tentions continue to be litigated cogently by both parties? When these factors are fairly taken into account, the conclusion is plain that today's action can be justified neither by the quasi-jurisdictional language which the Court needlessly includes in its opinion, nor by sound, practical considerations of discretion.