Terri Lee HALDERMAN et
al., Plaintiffs,
v.
PENNHURST STATE SCHOOL AND
HOSPITAL et al., Defendants,
United States of America,
Plaintiff-Intervenor,
Pennsylvania Association for Retarded
Citizens et al., Plaintiffs-Intervenors.

Civ. A. No. 74–1345.

United States District Court,
E. D. Pennsylvania.

Feb. 26, 1982.

David Ferleger, Philadelphia, Pa., for P. M.

Steven M. Coren, Philadelphia, Pa., for P. M.'s parents.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Pursuant to this Court's Order of January 5, 1982, a hearing was held on February 12, 1982 to consider exceptions filed by W. M. and B. M., the parents of P. M., a minor, and Chester County to the Report of the Hearing Master concerning the community placement of P. M.

P. M., a 12-year-old boy classified as profoundly mentally retarded, is four feet tall, 65 pounds. He was committed to Pennhurst in 1972. In accordance with this Court's Order of April 24, 1980, the Planning and Assessment Team including but not limited to the Pennhurst resident, his case manager, Pennhurst staff, and the par-

ent/guardian/certified advocate prepared an Individual Habilitation Plan for P. M. which provided for his transfer from Pennhurst to a community living arrangement in Chester County (the "County"). On October 13, 1981, the County Mental Health and Mental Retardation Officer issued notice of this proposed community placement. On October 19, 1981, W. M., P. M.'s father, requested a hearing on his objections to the transfer. Pursuant to this Court's Orders of April 24, 1980 and July 14, 1980, the Hearing Master, on October 28, 1981, scheduled a hearing for the purpose of determining both the voluntariness of the transfer and whether the community living arrangement would be more beneficial to P. M.'s habilitation than remaining at Pennhurst. The Hearing was held on November 24, 1981. In attendance at the Hearing were P. M., his parents W. M. and B. M. and their expert witnesses, the County through its representatives, including staff members of P. M.'s proposed community living arrangement, staff members of Pennhurst, and the Special Master.

The Hearing Master's Report of December 3, 1981 concluded that the proposed transfer would be more beneficial to P. M. than would continued residence at Pennhurst and that the transfer was voluntary. He therefore authorized and directed the County to proceed with the proposed transfer, and described in his Report the procedures, established by this Court, by which any participant in the hearing may take exception to the Hearing Master's report. On December 14, 1981, W. M. and B. M. and the County filed timely exceptions to the Report. They contended, among other things, that, since the parents of P. M. opposed the transfer, the community placement should not proceed.

P. M. was scheduled to be transferred as soon as practicable from Pennhurst to the home provided for him in the community. On December 22, 1981, counsel for W. M. and B. M. applied to this Court for a stay of the Hearing Master's Order. The Court scheduled a hearing on the stay and the exceptions to the Hearing Master's Report, which hearing was held on February 12, 1982. At the hearing, the Court was in-

formed by counsel for the County that P. M.'s movement to the community was scheduled for February 16, 1982. The Court instructed the County, through its counsel, that P. M. should not be transferred until the Court ruled on the exceptions to the Master's Report. For the reasons hereinafter set forth, the Court will adopt the Report of the Hearing Master and dismiss the exceptions which have been filed to his Report.

As is well-known to the litigants in the matter, the Court, in its Memorandum of December 23, 1977, 446 F.Supp. 1295, determined that the constitutional and statutory rights of the residents of Pennhurst had been violated by the defendants. The Court further found that the residents of Pennhurst were entitled to receive adequate habilitation in the least restrictive setting so that they might reach their potential as members of our society. "Habilitation" is a term of art used to refer to that education, training and care required by retarded individuals to reach their potential. The Court further found, based on the evidence presented at trial, that Pennhurst as an institution was unable to provide adequate habilitation to its residents and that arrangements should be made to establish community living arrangements which would provide adequate habilitation for the retarded residents of Pennhurst. The Court's Order of March 17, 1978 set forth in detail the procedures for accomplishing this objective.

On December 13, 1979, the United States Court of Appeals for the Third Circuit affirmed the bulk of the Court's findings of fact and conclusions of law, 612 F.2d 84 (3d Cir. 1979). In remanding the case to this Court, the Third Circuit stated however: "[T]here may be some individual patients who, because of advanced age, profound degree of retardation, special needs, or for some other reasons, will not be able to adjust to life outside an institution and thus will be harmed by such a change," and held that there should be a hearing to determine the relative habilitative benefit for each resident prior to his or her transfer to the community. 612 F.2d at 114–16.

In its Order of April 24, 1980, this Court appointed a Hearing Master and directed that he make findings and set forth reasons as to whether the living arrangements and services being provided the resident at Pennhurst are more beneficial to the resident's habilitation than the living arrangements and services which have been made ready in the community. The April 24, 1980 Order also provides that, in making such findings, the Hearing Master shall be guided by the presumption in favor of placing individuals in community living arrangements as mandated by the Third Circuit.

The Supreme Court of the United States on June 30, 1980 entered a Stay Order in connection with its grant of certiorari in *Halderman v. Pennhurst*. This Stay Order provided that only voluntary transfers from Pennhurst to the community could be made pending its final disposition of the case. On July 14, 1980, this Court held that the Stay Order did not prevent this Court from ordering "voluntary" transfers from Pennhurst to the community. The November 24, 1981 hearing regarding P. M. was held for the purpose of determining (2) whether the transfer was "voluntary", and (b) whether the program of habilitation provided for P. M. in the community living arrangement would be more beneficial to P. M.'s habilitation than the habilitation being provided to him at Pennhurst.

As heretofore pointed out, the Hearing Master found both that P. M.'s transfer to the community home was voluntary and that this move would be more beneficial to P. M. than would continued confinement at Pennhurst.

Before discussing the exceptions filed to the Hearing Master's Report, the Court will address the question as to whether the Hearing Master should continue to hold "voluntariness" hearings for the purpose of determining the voluntariness of a transfer from Pennhurst to the community. On August 13, 1980, the Commonwealth defendants filed a notice of appeal concerning this Court's Order of July 14, 1980 in which this Court directed the Hearing Master to hold "voluntariness" hearings in every instance where a resident of Pennhurst was being transferred to a community living arrangement. The Commonwealth defendants later petitioned to withdraw this appeal and the Court of Appeals granted this request and dismissed the appeal in an Order dated February 9, 1981. On October 13, 1981, the Commonwealth defendants filed with this Court a motion to discontinue the "voluntariness" hearings in light of the Supreme Court's decision in *Halderman v. Pennhurst*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), reversing the Third Circuit and remanding the case to the Court of Appeals for further proceedings.

This Court has recently concluded that the "voluntariness" hearings, mandated by the Supreme Court's Stay Order of June 30, 1980 are no longer required. The Supreme Court's remand to the Third Circuit on April 20, 1981 terminated its Stay Order of June 30, 1980 upon which this Court had based its Order of July 14, 1980 which directed the Hearing Master to conduct "voluntariness" hearings. A review of applicable decisions indicates that a stay order issued by an appellate court terminates upon that court's disposition of the appeal in the absence of an order to the contrary. *See American Manufacturers Mutual Insurance Co. v. American Broadcasting Paramount Theaters, Inc.*, 87 S.Ct. 1, 17 L.Ed.2d 37 (1966); 2 *Federal Procedures* 3:155 at 357 (1981). The Supreme Court's Stay granted on June 30, 1980 reads as follows:

Petitioners' motion for a stay of the judgment of the Court of Appeals, pending final disposition of the cases in this Court, is granted to the extent that the judgment mandates the movement of residents of the Pennhurst facility to "appropriate community living arrangements." In all other respects, the motion is denied.

From a reading of the above-quoted Order, it was apparent that the Supreme Court Stay was granted "pending a final disposition of the cases in this Court." There is nothing in the Stay Order or the Court's decision indicating that the Stay Order was intended to continue after the case was remanded. It was on this basis that this Court granted the motion of the

Commonwealth defendants to discontinue "voluntariness" hearings vacating this Court's Order of July 14, 1980. Therefore, the exceptions of W. M. and B. M. concerning voluntariness are moot and will not be discussed by this Court.

P. M.'s individual habilitation plan provides that adequate habilitation requires that P. M. be transferred from Pennhurst to a community residence which he would share with two other retarded males. The community residence is supervised by a live-in couple. It is a ranch-style dwelling operated by Community Homes, Inc. in Malvern, Pennsylvania. Because of P. M.'s ambulation difficulties and his inability to recognize dangerous situations, one staff person in addition to the live-in couple will be assigned to watch over P. M. during waking hours. One staff person will be required to be awake and on duty during the night, in addition to the presence of the live-in couple. The residence has been extensively adapted (e.g., safety gates to the kitchen and hallway, grab bars in the bathroom) to protect P. M. from all known risks.

P. M.'s individual habilitation plan provides for an extensive and detailed program for him in the residence, including self-help skill training (e.g., feeding, bathing, toileting, dressing), socialization, pre-language communications, occupational and physical therapy, and recreational activity such as swimming and field trips.

The proposed community program for P. M. results from and is reflected in his individual habilitation plan (Cty. Ex. at Hearing 1, 1A), which was developed at a meeting at Pennhurst on May 11, 1981, attended by P. M.'s parents, representatives and staff members of the proposed community residence, his school teacher, Pennhurst staff, and his County case manager. The plan was approved by the Office of the Special Master as offering living arrangements and services which will be more beneficial to P. M.'s habilitation than would be his continued residence at Pennhurst. The parents' objections to the plan were submitted to mediation under the auspices of Pennhurst Superintendent George Kopchick; the mediation process allayed some of the parents'

concerns (e.g., physical and occupational therapy). The parents, however, requested the November 24 hearing on relative benefit and voluntariness.

Since December 1980, P. M. has made some 20 daytime and overnight visits to the residence without any particular trauma. According to testimony presented at the hearing, he was initially somewhat overactive and anxious on his visits to the residence, but these reactions have lessened and he is now comfortable with the staff and other residents at the proposed community home.

After P. M. is transferred to the community residence, he will continue to attend his public school classes in the Liberty Forge program of the Chester County Intermediate Unit, where he has had the same teacher for six years and where he works on such things as self-awareness, self-concept, socialization, and fine motor skills. Thus, the Hearing Master found that there is no issue as to the adequacy or appropriateness of P. M.'s day programs. P. M.'s parents engaged in extensive negotiations with the case manager and as a result of these negotiations certain changes were made in the living arrangements for P. M. at the community residence. (Cty. Ex. at Hearing 2, 3). As a result, P. M.'s parents no longer have any objections to the education and treatment programs which have been planned for P. M.

In his Report of December 3, 1980, the Hearing Master thoroughly examined the parents' remaining objections to the proposed community placement of P. M. Their remaining objections appear to be that the proposed community home will not be as safe for P. M. as is Pennhurst and that as parents they have an absolute right to prevent his transfer to the community. The County has adopted the exceptions filed by the parents.

Rule 53(e)(2) of the Federal Rules of Civil Procedure declares that "[i]n an action to be tried without a jury, the court shall accept the master's findings of fact unless clearly erroneous." The Rule embodies the policy of the Federal Rules that, although use of a master should not lightly be resorted to, when a master is properly

used to achieve compliance with a Court's injunctive orders, the master's findings carry a presumption of correctness. *See Camden v. Stuart*, 144 U.S. 104, 118, 12 S.Ct. 585, 590, 36 L.Ed. 363 (1892); *Tilghman v. Proctor*, 125 U.S. 136, 149–50, 8 S.Ct. 894, 901–02, 31 L.Ed. 664 (1888). A party attacking a master's finding bears the burden of persuasion to show that the finding is clearly erroneous. *Esdale v. Edwards*, 28 F.R.D. 390 (D.N.C.1961); *Oil Chemical & Atomic Workers International Union v. NLRB*, 547 F.2d 575 (D.C.Cir.1976), *cert. den.*, 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977). Rule 53(e)(2) also provides: "The Court, after hearing, may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions."

■ The Hearing Master's Report is thorough, detailed, specific, and is supported by evidence in the record as to all findings of fact. The factual findings of the Master are not clearly erroneous, nor are his legal conclusions contrary to law. A matter under review may be considered clearly erroneous when the court is left with the definite and firm impression that a mistake has been made. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). The Court has no such reservations about the Master's Report.

■ Many of the exceptions to the Report challenge certain language in the document or question the Master's authority. These arguments criticizing the words chosen by the Master are not subject to review by this Court pursuant to Rule 53. Parties objecting to a Master's Report must complain of an error in a finding of fact or a conclusion of law. Second-guessing of the Master's characterization of events and parties or criticism of his writing style is not a proper subject for review by the Court. Similarly, the authority of the Hearing Master to conduct hearings such as that concerning P. M. is well-established. *See* Memoranda of February 20, 1981 concerning N.T., G.W., L.B., D.M., and P.T.

Furthermore, on December 13, 1979, the Court of Appeals, in remanding the case to this Court, stated: "[T]here may be some individual patients who, because of advanced age, profound degree of retardation, special needs, or for some other reasons, will not be able to adjust to life outside of an institution and thus will be harmed by such a change," and held that there should be hearings to determine the relative habilitative benefit for each resident prior to his or her transfer to the community. 612 F.2d at 114–16.

■ In Orders issued by this Court on April 24, 1980, the Court appointed a Hearing Master and directed that he "make findings and set forth reasons as to whether the living arrangements and services being provided the residents at Pennhurst are more beneficial to the resident's habilitation than the living arrangements and services which have been made ready in the community." The April 24, 1980 Order also provided that in making such finding, the Hearing Master shall be guided by the presumption in favor of placing individuals in community living arrangements as mandated by the Court of Appeals for the Third Circuit. The Court finds that the Hearing Master was well within the scope of his authority in all proceedings regarding P. M.'s community placement.

A brief illustration supports the fact-finding conducted by the Hearing Master. At the Hearing, W. M. and B. M., the parents of P. M., raised questions as to the safety of the proposed community residence as compared to Pennhurst. As the Report notes, P. M. has burned his hand and twice broken his leg while at Pennhurst. (Report at 17). By comparison, the community residence was specially planned to eliminate all known potential hazards to P. M.'s safety. A fence was erected to shield P. M. from the danger of a nearby highway, and safety gates were installed in the residence to shield him from areas in the residence which might prove to be sources of danger to P. M. As heretofore pointed out, the community residence will be staffed at all times.

Similarly, P. M.'s parents raised questions as to the adequacy of his medical care in the community, especially during emergencies. It was found by the Hearing Master that the Paoli Hospital is no farther from the community residence than the Phoenixville Hospital, which services Pennhurst, is from Pennhurst and that a competent medical staff will be available to P. M. at his community residence. The Hearing Master found that the primary physician in the community who will be responsible for his medical care at the community residence is accomplished in the treatment of retarded patients.

Throughout his Report, the Hearing Master addresses the factual concerns of P. M.'s parents and finds that the community living arrangement provided for P. M. is more beneficial to P. M.'s habilitation than continued residence at Pennhurst. The Court adopts the factual findings of the Hearing Master. The Court has reviewed the record in this case and has determined that the evidence presented at the hearing supports all of the findings made by the Master.

■ At the hearing of February 12, 1982, counsel for the parents contended that the parents should have a veto over the determination made by the Hearing Master that programs which have been designed for P. M. in his community living arrangement will be more beneficial to his habilitation than the habilitation P. M. would receive if he remained at Pennhurst.

The law has long recognized that parents have rights concerning decisions which may affect their children. More than six years ago, this Judge observed:

The Supreme Court has repeatedly recognized and afforded great weight to the rights of parental control and custody of their children and has given due respect to the powerful role of the familial relationship in our democratic society. It is plain that the interest of family integrity and the interests of parents in the care, custody and nurture of their children come to the court with a momentum of respect.

\*       \*       \*       \*       \*       \*

[P]arents' interest in directing the upbringing of their children is cognizable and substantial. Those who nurture the child and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations. The parents' claim to authority in their own household to direct the rearing of their children has been termed "basic in the structure of our society."

*Bartley v. Kremens,* 402 F.Supp. 1039, 1056, 1057 (E.D.Pa.1975) (citations omitted), vacated and remanded on other grounds, 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977), on remand sub. nom. *Institutionalized Juveniles v. Secretary of Public Welfare,* 459 F.Supp. 30 (E.D.Pa.1978), reversed and remanded, 442 U.S. 640, 99 S.Ct. 2523, 61 L.Ed.2d 142 (1979).

Mindful of this venerable legal tradition, this Court's Orders in this case have sought to provide for and encourage parental involvement in the process of developing an individual habilitation plan. Parents and guardians are urged to become intimately involved as members of the team which determines the individual habilitation plans for each member of the plaintiff class. Pursuant to this Court's Orders, parents are given the right to demand a hearing in the event they object to a habilitation plan transferring their son or daughter to a community living arrangement. At the hearing, they have a right to be represented by counsel, present evidence, and present argument as to why a community living arrangement will be less beneficial to their child's habilitation than his or her continued residence at Pennhurst. In addition, if the parents are dissatisfied with the Master's Report, they may file exceptions with the Court, as have the parents of P. M. in this case.

It was through the actions of his parents that P. M. was committed to Pennhurst. This Court's decision of December 23, 1977 mandates that P. M. receive adequate habilitation in the least restrictive environment. To implement this mandate, the planning assessment team, consisting of the parents

and persons with expertise in the habilitation of the retarded, including staff at Pennhurst, constructed an individual habilitation plan for P. M. The team found P. M. would benefit from the transfer to a community residence.

The parents participated in this planning and their preferences for treatment were accommodated insofar as consistent with the judgment of the professionals. The parents voiced their remaining objections to the plan, and pursuant to the procedures set forth in this Court's Orders received a hearing before the Master, and took exceptions to the Master's findings of fact. As this Court has heretofore determined, pp. 665–666, *supra*, the Master's findings are not clearly erroneous and must be adopted by this Court.

Despite the concessions they received regarding the formulation of P. M.'s individual habilitation plan, the parents now claim they have an absolute right to have their son remain at Pennhurst. Their contention appears to be based solely on the fact that they are the parents of this retarded minor child. Although both Chester County Administrator William A. McKendry and Pennhurst Superintendent George Kopchick testified at the hearing on November 24, 1981 that although they agreed that the proposed community placement would be of greater habilitative benefit to P. M., it was their personal opinion that the parents should have the right to nullify the transfer decision. Report at 6.

The parents make no claim that any Constitutional or statutory right is being violated by the transfer. On the contrary, the record before the Hearing Master clearly supports his finding that the individual habilitation plan providing for P. M.'s habilitation in the community will be more beneficial to P. M.'s habilitation than remaining at Pennhurst. The parents have not shown that P. M. would be harmed in any way by the transfer to the community residence. It appears from the record that one of their main concerns is the possibility that the state or county may require them as parents to make a financial contribution to the cost of P. M.'s habilitation in the community residence whereas at the present time they are not being required to contribute to the cost of P. M.'s care at Pennhurst. As found by the Master, this potential financial obligation of the parents cannot be determined at this time since the amount, if any, they may be required to contribute depends upon factors such as their own financial resources and actions that may be taken in the future by the Commonwealth or Chester County. In any event, as found by the Master, the financial concern of the parents, while understandable, has no direct bearing on the issue of the adequacy of the habilitation which P. M. will receive in the community residence.

Parents who place their children in private facilities are in a position to veto some aspects of their child's habilitation programs in such facilities, and if the parents' views are not accepted by the staff of the facility they may remove the child from the facility. In this case, the parents have been given more than merely the opportunity to express their views, they have been accorded procedural protections at several levels of the review. P. M. was committed by his parents to a publicly-funded facility and as parents they do not have the right to direct all aspects of their child's habilitation.

Were the Court to accept the parent's position, parents of all Pennhurst residents would be accorded the right to overrule the treatment decisions of the Pennhurst staff, including the location of their child within Pennhurst. Clearly, even the deference to parental wishes (as recognized by this Court in its Orders) does not give parents the right to veto the decisions of the retardation professionals unless and until the parents can show that the recommended programs for their child will not provide adequate habilitation and/or that some statutory or constitutional right is being violated by the decision.

The United States Supreme Court has recognized that a child has a substantial liberty interest in not being unnecessarily confined. *Parham v. J. R.*, 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979). The transfer of P. M. to a community residence is an acknowledgment of the fact that he has a right to habilitation in an

environment that is less restrictive than Pennhurst.

Both the majority opinion and the dissenting opinion in *Parham* acknowledged that the law does not give parents the unbridled right to determine the destiny of their minor children by pointing out that a state may override a parental decision when the physical or mental health of a child is jeopardized. Chief Justice Burger, writing for the majority, stated:

> Nonetheless, we have recognized that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized. See *Wisconsin v. Yoder, supra*, 406 U.S., at 230, 92 S.Ct., at 1540; *Prince v. Massachusetts, supra*, 321 U.S., at 166, 64 S.Ct., at 442. Moreover, the Court recently declared unconstitutional a state statute that granted parents an absolute veto over a minor child's decision to have an abortion. *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976).

And as stated by Justice Brennan in dissent in *Parham* :

> In our society, parental rights are limited by the legitimate rights and interests of their children. 'Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves.' *Prince v. Massachusetts*, 321 U.S. 158, 170, 64 S.Ct. 438, 444, 88 L.Ed. 645 (1945). This principle is reflected in the variety of statutes and cases that authorize state intervention on behalf of neglected or abused children and that, *inter alia*, curtail parental authority to alienate their children's property, to withhold necessary medical treatment, and to deny children exposure to ideas and experiences they may later need as independent and autonomous adults.
>
> This principle is also reflected in constitutional jurisprudence. Notions of parental authority and family autonomy cannot stand as absolute and invariable bar-

riers to the assertion of constitutional rights by children. States, for example, may not condition a minor's right to secure an abortion on attaining her parents' consent since the right to an abortion is an important personal right and since disputes between parents and children on this question would fracture family autonomy. See *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S., at 75, 96 S.Ct., at 2844.

The Hearing Master correctly concluded that it is simply not true that the law gives parents unbridled discretion in every area of decision-making. This is especially true in this case where P. M., a retarded child, has been committed to the custody and control of the Commonwealth and Chester County for the purpose of providing him with adequate habilitation in the least restrictive setting in order to enable P. M. to achieve his potential.

For the reasons heretofore determined, this Court will adopt the Report of the Hearing Master and dismiss the exceptions to the Master's Report. An appropriate order will be accordingly entered.