**William E. BROCK, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**ELSBERRY, INC., et al., Defendants.**

**No. 84–1205–CIV–T–17.**

United States District Court, M.D. Florida, Tampa Division.

May 22, 1987.

As Corrected May 28, 1987.

Bobbye D. Spears, Regional Solicitor, Patricia J. Craft, Office of the Solicitor, U.S. Dept. of Labor, Atlanta, Ga., for plaintiff.

James J. Cusack, Fowler, White, Gillen, Boggs, Villarea, & Banker, P.A., Tampa,

Fla., James J. McDonald, Jr., Fisher & Phillips, Atlanta, Ga., for defendants.

## MEMORANDUM OPINION

KOVACHEVICH, District Judge.

This cause came before the Court, for trial without jury, on April 14—16 and 20—21, 1987. The Court, having considered the pleadings, pretrial stipulations, stipulations at trial, the evidence presented, and arguments of counsel, hereby finds that Defendants have violated 29 U.S.C. § 1862(c) of the Migrant and Seasonal Agricultural Worker Protection Act of 1983 (MSPA). Temporary injunction enjoining Defendants from further violation shall issue, for the following reasons.

## FINDINGS OF FACT

1) The Secretary of Labor brought this action seeking an injunction pursuant to § 502(a) of the Migrant and Seasonal Agricultural Worker Protection Act of 1983 [29 U.S.C. § 1852(a) ], hereinafter MSPA or the Act, alleging that at all times pertinent hereto Defendants have unlawfully resisted, opposed, impeded, and interfered with officials of the Wage and Hour Division, United States Department of Labor, assigned to perform investigations pursuant to the Act, during the performance of such duties.

2) Defendants denied violation of § 512(c) based upon their construction of the statute, and filed counterclaim seeking declaratory and injunctive relief. Defendants assert that § 512 of the MSPA violates the Fourth Amendment of the United States Constitution to the extent that it is interpreted to authorize non-judicially supervised entries upon Defendants' properties to conduct investigations.

3) In 1981, the Tampa Area Office of the U.S. Department of Labor's Wage and Hour Division received a complaint from Florida Rural Legal Services alleging that farm labor contractors (FLC's) Rosa Lee Hall, Lionel Beaver, Dock Hunt, and Jimmy Jorden, Sr., were violating provisions of the Farm Labor Contractor Registration Act of 1963, as amended [7 U.S.C. §§ 2041, *et seq.*], hereinafter FLCRA, (the predecessor to MSPA) by not informing workers of the terms and conditions of employment, making improper monetary payments, making improper deductions from wages, and beating workers. (Trans. I, Pgs. 130, 152, 215, II–14). Area Director Chris Garringer reviewed the complaint and forwarded it to Assistant Area Director Larry Wilson (Tr. I–215) who assigned the matter to Farm Labor Specialist (FLS) George Fernandez for investigation. FLS Fernandez determined that the contractors in question were working at Elsberry Farms. (Tr. I–131).

4) At all times pertinent, Defendants have been agricultural employers within the meaning and coverage of the FLCRA, and the MSPA. Defendants are a group of family-owned companies engaged in the business of tomato and citrus farming in Ruskin, Florida, and their authorized representative is Ray E. Holcombe. Defendants conduct their commercial farming operation in agricultural fields in and around the Ruskin area. Defendants regularly contract with several farm labor contractors, who provide agricultural workers to Defendants. Defendants operate numerous migrant labor camps as part of their commercial farming enterprise, in which they provide housing for migrant workers.

5) Defendants, throughout the pertinent period, have charged workers for utilities at their housing at widely fluctuating fixed rates. (Pl. Exs. 16, 17; Tr. IV–9, 198). The crew leaders collect the money from the workers' wages and turn the money over to Defendants. Defendants do not maintain any records reflecting such deductions from wages. (Tr. IV–24, 204).

6) At least as early as December, 1981, Defendants were utilizing farm labor contractors to furnish agricultural workers to plant, cultivate or harvest tomatoes and citrus. Some of their contractors, either prior to or during the pendency of this investigation, have been enjoined from violating various provisions of FLCRA.

7) Since 1972, Defendants have utilized other farm labor contractors who have been judicially enjoined from violating various provisions of FLCRA, including Ida

Vereen, Charles Jorden, and Mrs. Harold Beaver.

8) Based on the complaint, in late 1981 Defendants were contacted about the pending investigation. On November 16, 1981, attorney Charles Kelso wrote FLS Fernandez on behalf of Defendants. He advised Wage and Hour that Defendants' position was one of cooperation. The letter stated that Ray Holcombe (spokesman for Defendants) would contact Fernandez "... to arrange a time when you can visit his office to check time cards and payroll records, interview employees, etc....". (Pl. Ex. 1).

9) FLS Fernandez contacted Holcombe and arranged an appointment to commence the investigation. On December 15, 1981, FLS Fernandez and Compliance Officer Richard Neely held a meeting with Ray Holcombe and explained that payroll records were to be checked, employees interviewed, and any problems concerning compliance with FLCRA discussed with Holcombe. (Tr. I–108, 135). Arrangements were made to have farm labor contractors Rosa Lee Hall and Lionel Beaver at Defendants' corporate office on January 20, 1982. (Tr. I–108, 137).

10) On January 20, 1982, the investigators returned to the corporate office to interview Hall and Beaver. However, Holcombe insisted on being present during the interviews. FLS Fernandez explained that the interviews must be private and cited FLCRA's authority requiring that the interviews be confidential. Holcombe would not allow private interviews, and the compliance officers left the premises. (Tr. I–110, 111, 137).

11) On January 27, 1982, the investigators returned to conduct interviews, and again were not permitted to conduct confidential interviews. (Tr. I–112, 140). Holcombe was again advised of the necessity of confidential interviews, to which he responded that no confidential interviews would take place on his property. (Tr. I–112, 140). Holcombe's sole reason for refusing to allow the interviews was to protect himself from being found in violation. He stated that his farm labor con-

tractors had been found in violation when investigated on farms in North Carolina, and that he had heard that other farmers in Hillsborough County had been found in violation as a result of such investigations.

12) Pursuant to Wage and Hour's policy of attempting to reach reasonable accomodations with subjects as to the conduct of investigations, (Tr. I–163, Def. Ex. 12), Area Director Garringer went to Defendants' office to see if the problems could be worked out. However, Holcombe still insisted on being present during employee interviews. (Tr. I–113, 216–217). Garringer also talked with an attorney for Defendants, Henry Huettner. This talk failed to produce an agreement. (Tr. I–219).

13) In accordance with policy, Garringer notified Assistant Regional Administrator Richard Robinette of the failure to reach an agreement that would permit the investigation to proceed. Robinette testified that he had a number of conversations with Huettner in an attempt to accommodate the parties. Eventually, he believed that an agreement had been reached. Finding credible the testimony of Robinette, this Court finds it was agreed that Wage and Hour would not conduct a safety and health inspection of the labor camps, as regular inspections by the Hillsborough County Health Department showed substantial compliance. The agreement provided that Defendants would be permitted to be present during the interviews with farm labor contractors since they were joint employers, and Defendants would permit the agricultural employee interviews to be in private, as long as those interviews did not interrupt employees in the fields. (Tr. II–6–9, II–111).

14) Robinette notified the Tampa office of the compromise agreement, and advised them to proceed with the investigation. (Tr. I–140, II–9). Pursuant to this agreement, Fernandez returned to the Defendants' office in April, 1982. Lionel Beaver brought the members of Rosa Lee Hall's crew to the corporate offices upon Holcombe's direction. However, when the interviews commenced, Beaver and Hol-

combe refused to leave the room, and confidential interviews could not take place.

15) At this point the file was sent to the Regional Office of Wage and Hour in Atlanta, Georgia. Alfred Perry, the Deputy Assistant Regional Administrator, discussed this matter with Huettner in an attempt to reach another agreement. As a result of these conversations, Perry understood that another agreement had been reached. Consequently, in late 1982, the file was returned to Tampa for completion of the investigation. Wage and Hour once again was met by Defendants' refusal to permit confidential interviews of employees. The investigation could not be completed. (Tr. V–5–6).

16) In April 1983, FLCRA was superseded by the Migrant and Seasonal Agricultural Worker Protection Act [29 U.S.C. §§ 1801, *et seq.*]. Since the complaint-based investigation of Defendants and their farm labor contractors had never been completed, and had in fact been intentionally delayed and thwarted by Defendants, Area Director Garringer again assigned the case to Fernandez to complete the investigation. (Tr. I–143, 144, 215).

17) Fernandez wrote a letter to Holcombe on June 8, 1983, advising that Wage and Hour intended to conduct an investigation commencing June 14, 1983. Holcombe was advised that the investigation would be limited to an opening conference, a review of the records, interviews of employees, and a closing conference, but would not include a safety and health inspection of the labor camps. (Pl. Ex. 2). Holcombe understood that Wage and Hour would not inspect the labor camps, vehicles, or farm labor contractor registration. (Tr. I–114).

18) When investigators Fernandez and Wilson arrived at the corporate office of Defendants, Holcombe advised them that they could not go into the fields, the labor camps, or enter the transport buses to do interviews, although Defendants did not own the buses. The only investigation permitted was inspection of the employment and payroll records. It was during this investigative visit that Holcombe turned to his daughter and niece and stated that he had "stiffled" or "snookered" Wage and Hour for two and a half years. (Tr. I–116, 146, 197, 198).

19) At all times pertinent hereto, records maintained by Defendants of the addresses of agricultural workers employed and/or housed on Defendants' farms have identified either the corporate address or the mailing address of the farm labor contractor furnishing the worker as the worker's permanent address. (Pretrial Stip. 26). The vast majority listed the corporate office, 101 Big Bend Road, P.O. Box 70, Ruskin, Florida, as the worker's address. (Tr. I–116, 117, 146).

20) Holcombe was advised that refusal to allow the investigation to continue, pursuant to § 512 of MSPA, could result in an injunctive action being filed. (Tr. I–116, 147, 199). Holcombe refused to allow the investigation to proceed. Accordingly, the file was forwarded to the Regional Office with a recommendation that injunctive action be initiated against Defendants.

21) The file was reviewed by Robinette at the Regional Office, and forwarded to the National Office with a recommendation that injunctive action be filed. The file, and Holcombe's conduct, were discussed. (Tr. II–13, 32, 33, Valin Depo. at 13, 14). Wage and Hour thereafter forwarded the file to the Regional Solicitor's Office in Atlanta with a recommendation for injunctive action under § 502(a) of MSPA. (Tr. II–13, 33; Valin Depo. at 13).

22) One last attempt to conduct the investigation was made. A letter was sent to Defendants again advising them of the nature of the investigation, and further advising Defendants of Wage and Hour's statutory authority to enter Defendants' property. (Pl. Ex. 3). Fernandez again went to the corporate offices, this time with FLS Barry Lenz. They were again advised that the investigation could not proceed anywhere on the property. It was at this time that Holcombe asserted that Wage and Hour must get a warrant in order to interview the workers. (Tr. I–118, 162; Pl. Ex. 4). Holcombe was again warned of potential injunctive action. The investigators left the premises, and the file was transmit-

ted to the Regional Office with recommendation that injunctive action be sought. The file was then referred to the Regional Solicitor's Office, with the concurrence of the National Office, and this injunctive action was instituted on September 9, 1984. (Valin Depo. pg. 13).

## THE ACT

23) The Migrant and Seasonal Agricultural Worker Protection Act was enacted in April, 1983. Its stated purpose is to remove the restraints on commerce caused by activities detrimental to migrant and seasonal agricultural workers; to require farm labor contractors to register under its provisions; and to assure necessary protection for migrant and seasonal agricultural workers, agricultural associations, and agricultural employers. 20 U.S.C. § 1801.

24) Section 512(a) of the Act states that: "[t]o carry out this Act the Secretary, either pursuant to a complaint or otherwise, shall, as may be appropriate, investigate, and in connection therewith, enter and inspect such places (including housing and vehicles) and such records (and make transcriptions thereof), question such persons and gather such information to determine compliance with this Act, or regulations prescribed under this Act."

25) Section 512(b) provides that: "[t]he Secretary shall conduct investigations in a manner which protects the confidentiality of any complainant or other party who provides information to the Secretary in good faith." Furthermore, under this section, "[i]t shall be a violation of this Act for any person to unlawfully resist, oppose, impede, intimidate, or interfere with any official of the Department of Labor assigned to perform an investigation, inspection, or law enforcement function pursuant to this Act during the performance of such duties."

26) Section 502(a) requires that: "[t]he Secretary may petition any appropriate district court of the United States for temporary or permanent injunctive relief if the Secretary determines that this Act, or any regulation under the Act, has been violated."

## ENFORCEMENT

27) Wage and Hour's Field Operations Handbook (FOH) is the basic internal guideline for use by the field compliance officers. However, it is neither the exclusive source of directives or interpretations by the agency, nor is it written or published for the public. (Tr. II–29, 61; Valin Depo. at 101; Blackburn Depo. at 16). The FOH is an evolving document which is developed from the statutes, legislative history, and experience from investigations in the field. (Valin Depo. at 50; Blackburn Depo. at 47–49).

28) The policies of Wage and Hour may not immediately appear in the FOH. Some directives issued by various officials in the area, regional, and national offices to field personnel are verbally communicated, or otherwise may not appear in the FOH. When provisions of the FOH are not clear to the compliance officers, they are to consult with the Area Director, who may obtain instructions from the Assistant Regional Administrator, Wage and Hour Administrator, or Deputy Undersecretary of Labor. (Tr. II–61–62).

29) Wage and Hour set forth its guidelines as to refusal to allow entry during MSPA investigation at FOH § 57e18 and the transmittal sheet for Revision 538. (Pl. Ex. 5; Def. Ex. 22; Valin Depo. at 42, 54, 61, 100; Tr. II–35, 96, 104). Although § 57e18 states that "simple refusal ... to allow CO on property does not constitute a violation ...", the transmittal sheet for Revision 538 states "... the Department has taken the position that when CO's are refused permission to make an investigation, ... the refusal will be treated as a violation of § 512(c) ... and the matter will be referred to the Regional Solicitor with a recommendation that appropriate injunctive relief be sought under § 502(a)."

30) DOL's policy has consistently been that should COs be refused entry during a MSPA investigation, they explain why entry is necessary and point out the statutory and regulatory authority for entry, and try to reach a mutual agreement as to a reasonable means of conducting the investiga-

tion. If no accommodation can be reached, the COs report to their supervisors who undertake the same procedure. If refusal continues, the matter is referred to the Regional Office for consultation with the Regional Solicitor and, if necessary, with the National Office. (Valin Depo. at 37, 47; Tr. I–224, II–38, V–37, 43).

31) Wage and Hour's policy has consistently been that persistent or repeated refusals to allow access to agricultural employees or other conduct which thwarts an investigation is not considered a "simple refusal" within FOH 57e18(d), (Pl. Ex. 5), but is considered a violation of § 512(c) MSPA. (Valin Depo. at 43, 56, 96; Tr. II–31, 33, 38, 39, 83–85, 105, 131, V–43). Section 512(c) is not alleged in incidents of "simple refusal," in accordance with Departmental policy of attempting to accommodate any employer to the extent reasonably possible in the conduct of an investigation. (Valin Depo. at 122; Tr. II–29–31).

32) Wage and Hour's official policy has never been that the impeding of an investigation must include force, violence, or threats of violence against the person of an official in order to constitute a violation of § 512(c). (Valin Depo. at 90; Tr. II–130.) It is also clear that the statute does not require violence or force or threats to be used against an official in order to constitute a violation of § 512(c).

33) The evidence establishes that Wage and Hour's position has consistently been to seek injunctive action, as allowed by the MSPA. Furthermore, the evidence clearly establishes that Wage and Hour properly followed its established procedure throughout the attempted investigations of Defendants, including numerous attempts to accommodate Defendants and work out a mutually satisfactory solution which would allow the investigation to be concluded. The Court notes that Defendants did not place any reliance on the FOH at any time, in their refusal to permit confidential interviews.

### THE MIGRANT CAMPS AND WORKERS

34) Since at least 1981, Defendants have operated 12 migrant labor camps in order to have an available supply of labor to meet harvest demands. (Tr. III–88). The camps are assigned on the basis of crew leaders, and residency is open to any member of the public who is available to work for Defendants, pays the camp charges, and does not engage in vandalistic behavior. (J. Jorden Depo. at 90–91; C. Jorden Depo. at 61; Tr. IV–193).

35) Residents of the camps include agricultural workers and their families. Some are non-English-speaking, and some illiterate. Infants, pre-schoolers, and elementary school age children are present. Defendants consider the camps open to residents, members of the public seeking employment, members of the public visiting the residents, and anyone who "doesn't have a conflict contrary to [Defendants'] interest". (Tr. III–107).

36) In the Southeast, migrant employment is transient and highly mobile. Harvesting seasons are, generally, of short duration. (Tr. V–89; Valin Depo. at 115). As crews work through the migrant season, they move quickly from field to field, farm to farm, and state to state. (Valin Depo. at 115; Tr. V–89, 90). As in this case, migrant workers often both work and live under the control of the agricultural employer and the farm labor contractor. (Valin Depo. at 107). As a group, migrant workers tend to live in poverty, to be isolated from the general community, and are not very literate.

37) Personal, confidential interviews with migrant and seasonal agricultural workers are essential to the conduct of an investigation under MSPA. The Act extends protection to the worker concerning the conditions of his or her recruitment, housing, transportation, piece and hourly rate wages, and deductions from wages. Compliance with the Act cannot be determined without personal communication with workers in a manner which does not reveal his or her identity as the source of information. (Tr. I–148, IV–82, V–41, 42, 91). The MSPA itself mandates that confidentiality is to be protected. [§ 512(b) ].

## CONCLUSIONS OF LAW

### ISSUES PRESENTED

1) Whether Defendants have violated § 512(c) of MSPA [29 U.S.C. § 1862(c) ] by resisting, opposing, impeding and interfering with officials of the United States Department of Labor, assigned to perform an investigation pursuant to the Act, during the performance of such duties.

2) Whether Plaintiff is entitled to judgment, pursuant to § 402(a) of the Act [29 U.S.C. § 1852(c) ], temporarily or permanently enjoining Defendants from future violation of § 512(c).

3) A. Whether MSPA should be interpreted as authorizing the Plaintiff to make non-judicially supervised entry onto Defendants' property for the purpose of interviewing agricultural workers in a confidential manner.

B. If so, does such an interpretation make the statute unconstitutional and as a violation of the Fourth Amendment, as Plaintiff asserts.

### ISSUE I—VIOLATION OF § 512(c)

█ Public policy, and the provisions and purpose of the MSPA, demand that the Federal government be provided the opportunity to determine compliance with the requirements of the Act. Migrant and seasonal workers occupy a unique situation and station in life, which by its very nature requires protection. We are not dealing with a seizure of property in this action. We are dealing with the necessity for a chance to interview human beings who are in a particularly sensitive situation, and who themselves have constitutional, and statutory rights which must be protected.

The evidence establishes that because of the nature of employment and housing conditions of the migrant and seasonal worker, effective communication between agency personnel and agricultural workers cannot be achieved by interviews in the presence of the farm labor contractor or agricultural employer, or through correspondence which must go through the contractor or employer to get to the worker. The Court finds that in order to carry out the provisions of the Act, agency personnel must have access to the workers either in the fields where they work, or in the labor camps where they are housed, in order to effectively obtain information through confidential interviews.

This Court finds that § 512(a) of MSPA, [29 U.S.C. § 1862(a) ], expressly authorizes the Secretary to enter places for the purpose of questioning persons as part of the Secretary's duty to conduct investigations pursuant to the Act, including migrant labor camps and agricultural fields. MSPA, like its predecessor, the FLCRA, "... is remedial in nature and should be given broad construction, in order to effectuate its statutory purpose." *Rivera v. Adams Packing Assoc., Inc.,* 707 F.2d 1278, 1281 (11th Cir.1983); *Soliz v. Plunkett,* 615 F.2d 272, 275 (5th Cir.1980); *Marshall v. Coastal Growers Assoc.,* 598 F.2d 521, 525 (9th Cir.1979).

By its express language, § 512(a) directs that the Secretary "shall" conduct investigations in order to carry out his responsibility to "ensure necessary protections for migrant and seasonal workers ..." (29 U.S.C. § 1801). In conducting such investigations, the Secretary is vested with broad "authority to obtain information", including entering places to question persons in order to determine compliance with the Act. This Court is bound to construe the Act in a way that accomplishes MSPA's purpose, as evidenced by the broad language of the statute and the clear recognition by Congress that effective enforcement of the Act depends upon the Secretary having authority to enter places where he can have access to migrant and seasonal agricultural workers whom the Act is designed to protect.

It would be hoped, as has proved true in practice, in almost every case, accommodation between agency personnel and employers and farm labor contractors can be reached. Interview times which do not disrupt work in the fields have been arranged, as have been locations satisfactory to all parties. In this case, numerous attempts to find a neutral location, and satisfactory interview times were made. However, af-

ter repeated and sincere efforts by the government to accommodate Defendants' expressed concerns, no accommodation could be reached. Defendants flatly and consistently refused to permit the necessary confidential interviews.

■ Defendants' claim that the non-violent nature of their interference, and their eventual demand for a search warrant before they would allow agents to effect the interviews, causes their hinderance of the investigation to be lawful, and merely an assertion of their Fourth amendment rights. The Court is not impressed with this argument. The evidence clearly shows that Defendants consistently led the Government to believe that compromise had been reached, and then repudiated the compromise agreement when the agents appeared to complete their investigation. Defendants indeed "snookered" the agency for several years. The investigation has never been completed. It will be completed now.

This Court finds that the continual and repeated refusal to allow confidential interviews, under the circumstances of this case, is clearly a violation of § 512(c). Accordingly, Defendant's Motion for Directed Verdict, alleging that Defendants' conduct was not a violation of § 512(c), is hereby denied.

## ISSUE II—INJUNCTIVE RELIEF

■ Section 502(a) expressly requires that: "[t]he Secretary may petition any appropriate district court of the United States for temporary or permanent injunctive relief if the Secretary determines that this Act, or any regulation under the Act, has been violated." This Court has already determined that Defendants' course of conduct since 1982 is a violation of § 512(c). Accordingly, injunctive relief is appropriate.

The Court will not grant a permanent injunction in this instance. Future investigations are not at issue in this case. Accordingly, a temporary injunction shall issue enjoining Defendants from interfering with the current investigation. Confidential interviews shall be permitted at reasonable times, and in a reasonable manner. All necessary records shall be provided for inspection. Defendants' have assured the Court that they will comply with this Court's determination. (Trans. I–125). This Court does not anticipate any further violation of the Act by these Defendants.

## ISSUE III—NON–JUDICIALLY SUPERVISED ENTRY

This Court has already determined that the Act allows non-judicially supervised entry onto property for the purpose of interviewing agricultural workers in a confidential manner. Defendants' affirmative defenses and counterclaim for declaratory and injunctive relief allege that to the extent § 512 of MSPA is interpreted to authorize either warrantless or non-judicially supervised entry onto Defendants' commercial farming property by Department of Labor compliance officers conducting an MSPA investigation, it is unconstitutional as a violation of Defendants' Fourth Amendment rights. (Pre-Trial Stip. 16).

In evaluating the merits of Defendants' claim, as in every case where a question is raised as to the constitutionality of a statute, the Court begins with the fundamental doctrine that there is a strong presumption in favor of the constitutionality of the statute. *See, Walters v. National Assoc. of Radiation*, 468 U.S. 1323, 105 S.Ct. 11, 82 L.Ed.2d 908 (1984). The consequence of this presumption in favor of the validity of the Act is that Defendants' burden of proof is a substantial one. Defendants must make a clear showing that the authority granted transgresses constitutional limitations. Pursuant to the prudential rule that "... a court should scrutinize the constitutionality of a statute only as applied to the case before it ...", *Williams v. United States*, 704 F.2d 1222, 1226 (11th Cir.1983), Defendants must show how, as to them under the particular facts of this case, MSPA is unconstitutional. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985); *Kremens v. Bartley*, 431 U.S. 119, 136, 97 S.Ct. 1709, 1718, 52 L.Ed.2d 184 (1977); *United States v. Raines*, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960).

■ The Court holds that the investigative authority granted the Secretary under MSPA, including the right to enter onto property to interview persons, is constitutionally permissible on its face and as applied in this case. The Act, by its plain language, provides that the Secretary seek to enter places only as necessary and appropriate to conduct specific investigations, and, when met with resistance, to make no entry without first seeking injunctive relief in the district court. This procedure has properly been followed. In this way, the district court supervises and enforces the completion of the investigation. Accordingly, the Secretary's exercise of investigative authority under MSPA is constitutionally permissible. Indeed, this current proceeding provides Defendants with the judicial supervision of entry onto their property which they assert is required.

In view of this holding, the Court will not address the issue of whether the conduct of all investigations pursuant to the Act come within the ambit of the Fourth Amendment. Under the facts of the present case, Defendants' conduct has been a clear violation of the Act, and as such, warrants injunctive action, pursuant to the statute. The Court stayed ruling on Plaintiff's motion to dismiss pending evidentiary development at trial. It is

ORDERED that Plaintiff's Motion to Dismiss Defendants' Counterclaim for Declaratory and Injunctive Relief is hereby granted. Defendant's oral motion to introduce transcript of trial deposition of Chris Garringer into evidence is denied. Defendants' motion for Directed Verdict is denied. All pending matters upon which specific ruling has not been made are hereby denied. Defendants are hereby enjoined from further interference with the current investigation. Records shall be produced for inspection, and confidential interviews permitted in the labor camps or in the fields, to be determined by Wage and Hour under current policy.