**Joe ROE, etc., et al.**

v.

**The CITY OF NEW ORLEANS, et al.**

**Civ. A. No. 90–3097.**

United States District Court,
E.D. Louisiana.

March 8, 1991.

William E. Rittenberg, Steven Scheckmann, ACLU of Louisiana, New Orleans, La., for plaintiffs.

Ralph D. Dwyer Jr., New Orleans, La., for Civil Service Com'n.

Jay Alan Ginsburg, Asst. City Atty., New Orleans, La., for City and individual defendants.

## ORDER AND REASONS

PATRICK E. CARR, District Judge.

This matter is before the Court on the plaintiffs' motion for class certification [Record Document No. 10].

Determining that oral argument was not needed, the Court CANCELED the hearing on the motion, previously set for February 27, 1991. For the following reasons, the Court DISMISSES the action at the plaintiffs' costs for want of jurisdiction through lack of standing and/or for failure to state a claim upon which relief can be granted and DENIES the motion AS MOOT.

This § 1983 action concerns the City of New Orleans' substance abuse policy to eradicate the harmful effects of drug abuse in the workplace. Three permanent City employees and one non-City employee facially attack broad portions of the policy's drug-testing provisions on the ground that these portions permit unreasonable searches and deny procedural due process; the four assert their claims individually and on behalf of all City employees not in certain "security or safety sensitive positions," all prospective City employees, and all citizens who use the services of the City and City Hall. None of the four asserts that he or she has been or reasonably expects to be subject to any drug testing.

## I.

In 1990, the New Orleans City Civil Service Commission and the City's Chief Administrative Officer promulgated identical written Substance Abuse Policies ("Policies").[1] *Compare* Plaintiffs' Supplemental Memorandum in Support of their Motion at 4 n. 4 *with id.* Exh. "1". Together, these Policies apply:

> to all Classified and Unclassified Service employees, inclusive of regular full-time, part-time, commissioned, probationary, temporary, or contract employees, and to applicants for employment with the City.

*Id.* § 5, at 2. Generally, the Policies prohibit the unauthorized use, influence, or possession of alcohol or drugs on City premises or "while on City business and/or during working hours." *See id.* § 6, at 2–3. The Policies provide for the following "enforcement activities":

> a. WORKPLACE SEARCHES AND INSPECTIONS—When reasonable cause or suspicion exists, the City reserves the right, at all times to conduct unannounced searches and inspections of City facilities, properties, as well as employees' and other persons' effects. Such searches can include but not be limited to lockers, baggage, briefcases, boxes, bags, parcels, lunchboxes, food/beverage containers, desks, tool boxes, clothing, and vehicles for the purpose of determining if such employees or other persons are in possession, use, transportation or concealment of any of the prohibited items and substances cited in this policy.

> These searches may be initiated without prior notice and may be conducted at times and locations as deemed appropriate by the City officials and/or their designated representatives. At no time will employees or other persons be touched nor will any clothing be removed during these searches and inspections. These searches may take place when employees and other persons enter into or depart from the City's premises, properties, and work areas described previously. When reasonable cause or suspicion exists, the

---

1. While the plaintiffs did not attach copies of these written Policies to their complaint, the Court may nonetheless take judicial notice of these municipal regulations under F.R.Ev. 201(b)(2). *See Matter of Waller Creek, Inc.,* 867 F.2d 228, 238 n. 14 (5th Cir.1989). Further, it is apparent that the plaintiffs do not dispute what the text of the Policies contain, as the plaintiffs themselves in response to the defendants' opposition have submitted a copy of the City's entire Policy.

Appointing Authorities or their properly authorized non-law enforcement representatives (who may use drug detection dogs to assist in the search) will perform the searches.

b. SUBSTANCE ABUSE TESTING, MEDICAL EXAMINATIONS AND FITNESS FOR DUTY PHYSICALS—The City also reserves the right, in the following circumstances, to require employees to submit to but not necessarily limited to urine drug tests, breathalizer tests, blood tests or other medical examinations as a condition of employment or continued employment. These substance abuse testing procedures will be conducted in order to determine the use of any illegal or unauthorized drugs or substances prohibited by this policy or to prove the employee's satisfactory fitness for duty. These tests may be unannounced and may be utilized under the following circumstances:

1. *Pre-employment / pre-placement/ end of probationary period testing* will be required of any qualified applicant as a condition of consideration of employment, being approved for any sensitive position or all other types of positions, or as a requirement in a probationary period as consideration for awarding permanent employment status to an employee.

2. *If an employee suffers an occupational on-the-job injury* (requiring a visit to a doctor) or following a serious or potentially serious accident, near-miss or incident in which safety precautions were violated.

3. *When a supervisor has reasonable suspicion* to suspect that an employee or other person shows signs of possible alcohol abuse or substance abuse such that there is intoxication, impairment in normal sensory and/or motor body functions, or other articulable facts that would lead a supervisor to be concerned about the individual's safety or the safety of the general public and others due to an employee's physical condition or behavior while working.

4. *When the City has reasonable suspicion of probable abuse* by a number of employees based on information such as an unusual amount of post-accident positive test results, incidents of theft, lost productivity or reports of unexplained personnel behavior, or other facts that would lead management to test specific individuals, groups, an entire department, work area, shift, division, work location or sensitive job classifications due to safety/security concerns.

5. *Routine, periodic or intermittent* testing of all employees with probationary status or employees in "safety sensitive" positions. These employee categories have job scopes requiring the carrying of firearms (and continuing certification to maintain its proper use) or affect the health, welfare and/or safety of the public, co-workers and the individual employee. These tests will determine the use of any illegal or unauthorized drug, alcohol or other substances prohibited by this policy.

6. *Random testing* may be used routinely for those employees in "safety-sensitive" positions. Such employee classes of work are considered to be, but not limited to fire suppression personnel, such as fire fighters, commissioned police/security officers (who have authority to carry weapons) or any officer/fire fighter who may be in a dispatching, medical/rescue or other line supervisory position. Any form of substance abuse by these groups of employees may affect the safety of operations through unsafe work behavior/performance or error in judgment, or where substance abuse could jeopardize the safety and well-being of either the employee, other personnel, or the general public.

7. *Government-required testing* may be routinely utilized by the City as mandated by the United States Department of Transportation (DOT), the Louisiana Department of Public Safety (LDPS), or other agencies for those employees working in regulated/safety/sensitive positions. These positions

are classified by DOT/LDPS regulations as drivers of commercial motor vehicles operating in interstate/intrastate commerce. Affected employees will be notified accordingly if their jobs fall within the definition of regulated/safety/sensitive positions.

This testing will be applicable to all employees who are required to have a federal commercial driver's license or who drive or have occasion to drive any City vehicle which requires hazardous materials placards, or who drive a city truck, or a truck with a trailer with a gross combination vehicle weight rating (GVWR) of more than 8000 lbs.

The types of testing for this category are the following:

a. Periodic testing.

b. Reasonable cause (or suspicion) testing.

c. Random testing.

d. Post-accident testing (as the result of a DOT/LDPS reportable accident).

e. Commercial driver's license enforcement testing (as may be required by law).

8. *Substance abuse testing procedures and/or medicals.*

a. Post-counseling/rehabilitation substance abuse testing procedures (inclusive of medical examination) will be conducted when an employee returns to work from a long illness, disabling injury, extended absence, reduction in force, or as a result of a condition of reinstatement upon completion of a reasonable drug and alcohol treatment or counseling program.

b. Workplace testing situations may be altered or changed and additional samples may be requested from those employees who are employed in safety/sensitive positions and whose activities are regulated by either the United States Department of Transportation's guidelines or the Louisiana Department of Public Safety. Additional regulated testing may be limited to certain drug classifications such as the following: marijuana, cocaine, opiates, PCP (phencyclodine *[sic]*) and amphetamines. Affected employees shall be notified of these additional tests and as to what specific drugs the government has prohibited for use.

c. SAMPLE COLLECTIONS AND TESTING RESULTS.

1. Searches (including urine sampling or drug screening) and inspections by authorized City personnel may be conducted from time to time without prior announcement. Urine samples may be collected, sealed, and monitored by professional collection specialists in the presence of either their company's or City's supervisors, transported and stored in compliance with NIDA guidelines to an approved (licensed and certified) laboratory for actual testing. All collections of specimens for testing shall be collected, stored, and transported in compliance either with NIDA (National Institute on Drug Abuse) or College of American Pathologists guidelines. Additionally, any required blood collection shall be performed by either a City nurse/doctor, an outside health care facility, or practitioner designated by the City.

2. Each employee specimen (sample) shall be screened (using an immunoassay-type test) and tested by a laboratory certified for forensic urine drug testing by the College of American Pathologists and shall be monitored and shall be approved by the Bureau of Health Services Financing, Health Standards Section of the Louisiana Department of Health and Hospitals.

3. All first-test specimens identified as *positive* on the initial test shall be *confirmed* by a second test using gas chromatography/mass spectrometry (GC/MS) techniques (specificity-type methodology). Laboratories performing second confirmatory tests on employee specimens must have obtained certification from NIDA (National Institute on Drug Abuse) and operate in accordance with those standards.

4. All searches, inspections and urine samplings will be performed with concern for each employee's or person's

personal privacy, dignity and confidentiality. The results of any program testing will be considered a confidential record disseminated strictly on need-to-know basis or as may be legally required. Records shall *not* be maintained in personnel files. Illegal substances, drugs, stolen property and other prohibited items discovered through these searches and inspections may result in the proper law enforcement personnel being advised in this regard (as required by law).

5. The City shall utilize the services of a Medical Review Officer (MRO) to interpret a second-test *confirmed* positive result as it applies to the employee's explanation. A MRO is a licensed physician who is responsible for receiving laboratory results generated by the City's drug testing program. The MRO has knowledge of substance abuse disorders and has appropriate medical training to interpret and to evaluate an individual's positive test result(s) together with the individual's medical history, and any other relevant biomedical information.

*See id.* § 8, at 5–9 (emphasis in original). Finally, the Policies provide the following "notice of disciplinary action for policy violations by City employees":

a. The City may require employees and others to participate in substance abuse testing such as urinalysis or blood tests or search activity in order to assist the City in providing a safe, healthful and productive working environment, and to comply with existing federal/state laws as a condition of continued employment. Failure to comply with the provisions of this policy shall be grounds for constructive disciplinary action up to but not limited to written reprimands, suspensions or discharge from employment. In certain situations (as defined below), discharge will occur even for a first-offense violation, except as otherwise provided in this policy.

b. A *first offense discharge* shall be invoked if an employee commits one (1) of the following violations:

1. The employee either refuses to participate in or submit to a search or inspection, urine drug or blood test as outlined in Section 8 of this policy regarding enforcement activities.

2. The employee has submitted to a test and, as outlined in Section 8, has attempted to degrade, dilute, switch, alter, or tamper with his/her sample.

3. While on city premises, the employee was caught *using*, manufacturing, distributing, dispensing, selling or possessing any illegal or unlawful drugs.

4. Being convicted for illegal substance possession (either on or off the job).

5. As the result of a first offense *confirmed* (MRO certified) positive test result as established by City Civil Service Rules for the use of alcoholic beverages or any of the illegal and/or unlawfully obtained (used) drugs prohibited by this policy while working.

6. The use of alcohol on the job, as outlined as a violation of this policy, including a conviction for driving while intoxicated (DWI) during working hours.

c. Employees shall always have the opportunity to present an alternative explanation as to the reason for the positive test result. *NO* adverse action will be taken against any employee based on a confirmed positive testing result if a reasonable doubt exists as to either the accuracy of the result or the chain of custody of the sample.

d. Any employee, confirmed positive, upon his written request, shall have the right of access within seven (7) working days to records relating to his/her drug tests and any records relating to the results of any relevant certification, review, or suspension/revocation-of-certification proceedings.

*See id.* § 10, at 10–11 (emphasis in original).

Answers to the plaintiffs' interrogatories indicate that over 250 unclassified and over 5800 classified city employees are subject to either or both of the two Policies.

The first-amended complaint contains the following description of the four named plaintiffs:

a. Joe Roe is a building inspector who delivers permits, monitors construction, checks zoning regulations, who is a permanent employee who has worked for the City of New Orleans for eight (8) years, and is subject to random urinalysis according to the City's substance abuse testing policy.

b. Bill Doe is a building inspector who delivers permits, monitors construction, checks zoning regulations, who is a permanent employee who has worked for the City of New Orleans for eight (8) years, and is subject to random urinalysis according to the City's substance abuse testing policy.

c. Lawrence Warner is a data entry operator who is a permanent employee who has worked for the City of New Orleans for five (5) years.

d. Jane Doe is a resident of New Orleans who may apply for employment with the City of New Orleans, and who does use services of the City of New Orleans, including entering City Hall.

Joe Roe, Bill Doe, and Jane Doe sue anonymously "to protect their rights of privacy." The four plaintiffs seek to bring their action as a class action to include the following three subclasses:

(a) all employees of the City who are not classified as "Category I" or "Category II" "security or safety sensitive position;" (b) all prospective employees of the City; and (c) all private citizens who use the services of the City and City Hall.

Named as defendants are the City of New Orleans and its Mayor (Sidney Barthelemy) and Director of Personnel (J. Michael Doyle Jr.); and the New Orleans City Civil Service Commission and its Chairman (Barbara G. Thompson), Vice-Chairman (Horace A. Thompson III), and three Commissioners (Addison Carey Jr., Patrick R. Hugg, and C. Hearn Taylor). The seven individual defendants are sued in their official capacities only.

The plaintiffs assert a facial challenge seeking to enjoin the City and its officials from enforcing the "mandatory and random urinalysis substance abuse testing" portions of the Policies against the class of persons listed above. The plaintiffs contend that "[t]he City's programs authorize the random urine testing of certain designated employees, without any reason to suspect the particular individuals tested of drug use, and notwithstanding the absence of any documented problem of drug use by employees of the City of New Orleans, in violation of plaintiffs' rights under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution and the Constitution of the State of Louisiana." The plaintiffs also contend that "[t]he substance abuse testing methods to be used under the City of New Orleans' plan present a substantial risk that employees will be falsely identified as having used illegal drugs." The plaintiffs do not seek monetary damages, other than attorney's fees under 42 U.S.C. § 1988.

The plaintiffs now move to certify their proposed class action. The defendants do not specifically dispute that the proposed class meets the four enumerated requirements in F.R.Civ.P. 23(a). The defendants do dispute, however, whether the four named plaintiffs have Article III standing in order to represent the proposed class.

## II.

In order for this Court to have subject matter jurisdiction over this proposed class action, at least one of the named plaintiffs must satisfy at this time the threshold requirement of standing imposed by Article III of the federal constitution.

Plaintiffs in federal court must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction. There must be a personal stake in the outcome such as to assume that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.... Abstract injury is not enough. It must

be alleged that the plaintiff has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct. The injury must be both real and immediate, not conjectural or hypothetical. Moreover, if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.

*O'Shea v. Littleton,* 414 U.S. 488, 493–94, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974) (footnotes, quotation marks, and citations omitted); *see Blum v. Yaretsky,* 457 U.S. 991, 1001 n. 13, 102 S.Ct. 2777, 2784 n. 13, 73 L.Ed.2d 534 (1982); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 40 n. 20, 96 S.Ct. 1917, 1925 n. 20, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343 (1975); *see also Harris v. McRae,* 448 U.S. 297, 320 n. 23, 100 S.Ct. 2671, 2690 n. 23, 65 L.Ed.2d 784 (1980); *Sosna v. Iowa,* 419 U.S. 393, 402, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975) ("There must be ... a named plaintiff who has such a case or controversy at the time the complaint is filed, and at the time the class is certified by the District Court pursuant to Rule 23 ....").

Inclusion of class action allegations in a complaint does not relief a plaintiff of himself meeting the requirements for constitutional standing, even if the persons described in the class definition would have standing themselves to sue. If the plaintiff has no standing individually, no case or controversy arises. This constitutional threshold must be met before any consideration of the typicality of claims or commonality of issues required for procedural reasons by Fed.R.Civ.P. 23.

*Brown v. Sibley,* 650 F.2d 760, 771 (5th Cir. Unit A 1981).

It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record. And it is the burden of the party who seeks the exercise of jurisdiction in his favor clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute. Thus, the petitioners in this case must allege facts essential to show jurisdiction. If they fail to make the necessary allegations, they have no standing.

*FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, ——, 110 S.Ct. 596, 608, 107 L.Ed.2d 603 (1990) (brackets, quotation marks, and citations omitted).

■ As a preliminary matter, the plaintiffs note that the answer of the Civil Service Commission, its five officer defendants, and defendant Doyle admits the class-action allegations in the first-amended complaint. Thus, the plaintiffs argue that these seven defendants may not now attack the plaintiffs' standing. The Court must reject the plaintiffs' argument. Because standing concerns federal subject matter jurisdiction and objections to subject matter jurisdiction are not waivable, these defendants may challenge the plaintiffs' standing irrespective of any answer to the plaintiffs' complaint. *Cf.* F.R.Civ.P. 12(h)(3).

■ An employee asserting a class action attack on a drug testing program of his employer generally has standing where the program necessarily requires mandatory testing of all employees, *see, e.g., Taylor v. O'Grady,* 669 F.Supp. 1422 (N.D.Ill. 1987), *vacated and remanded on other grounds,* 888 F.2d 1189 (7th Cir.1989), or where the employee and the class he represents have already been tested under the employer's program and have been or will be subject to adverse action by the employer, *see, e.g., Burka v. New York City Transit Authority,* 739 F.Supp. 814 (S.D. N.Y.1990). But the instant case does not fit either of those two categories.

The Court emphasizes what the plaintiffs' complaint is attacking: the Policies' provisions relating to searches to be made "without any reason to suspect the particular individuals tested of drug use," that is, the "testing ... carried out without reasonable suspicion of substance abuse by any particular employee." *See* Plaintiffs'

First–Amended Complaint ¶¶ 1, 27. With this gloss, the Court turns to the various portions of the Policies arguably now under attack.

## A. *Sections 8(a), 8(b)(3), and 8(b)(4)*

■ The provisions in sections 8(a), 8(b)(3), and 8(b)(4) of the Policies do not authorize "searches without any measures of individualized suspicion." *Cf. National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). On the one hand, these three provisions only apply when "reasonable cause or suspicion" in the case of section 8(a), "reasonable suspicion" in the case of section 8(b)(3), and "reasonable suspicion of probable abuse" in the case of section 8(b)(4) exists. On the other hand, principles of statutory construction, *see United States v. Cuomo*, 525 F.2d 1285, 1291 & n. 17 (5th Cir.1976) (on interpreting terms of art in a statute); *Backhus v. Transit Casualty Co.*, 549 So.2d 283, 289 (La.1989) (same), as well as common sense compel that this suspicion refers to reasonable suspicion of a violation of the Policies within the understanding of Fourth Amendment jurisprudence, that is, to reasonable suspicion of the unauthorized use, influence, or possession of alcohol or drugs on City premises or while on City business and/or during working hours in violation of section 6 of the Policies. Thus, the plaintiffs' attack cannot reasonably be construed to extend to these three sections.

In any event, the plaintiffs cannot show that they are in immediate danger of being the object of any testing under any such reasonable suspicion. *Cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *O'Shea*, 414 U.S. at 493–99, 94 S.Ct. at 675–77. Notably, none alleges that he or she has ever been or is likely to be suspected of drug use. *Cf. Blum*, 457 U.S. at 1000–02, 102 S.Ct. at 2784–85. In other words, none can show "some actual or threatened injury" from these three sections to satisfy both the constitutional and prudential elements of standing in federal court. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

It is arguable that section 8(a) authorizes the City to search the personal effects of all non-City employee visitors while they are on City premises such as City Hall inasmuch as the section authorizes searches of "other persons' effects," *but cf.* Policies § 5 (providing that the Policies apply to employees and employment applicants for the City); any such authorization under this section, however, is given only "[w]hen reasonable cause or suspicion exists." In other words, section 8(a) does not authorize suspicionless searches of either employees or non-employees.

It is also arguable that section 8(b)(4) authorizes the City to search entire departments, but any such authorization under this section is similarly given only "[w]hen the City has reasonable suspicion of probable abuse." Because unconstitutional constructions should be avoided where reasonable, *see Buras v. Board of Trustees of Police Pension Fund of the City of New Orleans*, 367 So.2d 849, 851 n. 4 (La.1979) (citing *Pearce ex rel. Structural Pest Control Commission v. Sharbino*, 254 La. 143, 223 So.2d 126, 128 (1969)); *cf. Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988) (same for federal statutes), the reasonable suspicion in such an instance must reasonably be interpreted to apply to the entire department. In other words, this section authorizes a search of all members in a particular department or group only when reasonable suspicion of substance abuse exists as to *each* member of the department or group.

■ To the extent the plaintiffs construe these sections of the Policies otherwise to authorize suspicionless searches and thereby possibly provide standing to one or more of the plaintiffs, the Court dismisses their claim on the merits as a matter of law. First, the Court may dismiss a claim on its own initiative under F.R.Civ.P. 12(b)(6) for failure to state a

claim upon which relief can be granted. *See Small Engine Shop, Inc. v. Cascio,* 878 F.2d 883, 887 (5th Cir.1989) (citing *Shawnee International, N.V. v. Hondo Drilling Co.,* 742 F.2d 234, 236 (5th Cir. 1984)). Second, interpretation of these written Policies is a wholly legal function subject to *de novo* review (as opposed to a fact-finding function protected by the clearly-erroneous standard of review). *See USX Corp. v. Tanenbaum,* 868 F.2d 1455, 1457 (5th Cir.1989); *see also McDermott International, Inc. v. Wilander,* — U.S. ——, ——, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991). *But cf. Balliache v. Fru–Con Construction Corp.,* 866 F.2d 798, 799 (5th Cir.1989) (affording "great deference" to the federal district court's state-law interpretation of state laws and parish ordinances on a 12(b)(6) motion). Third, this legal issue was raised in the defendants' opposition memorandum, to which the plaintiffs exercised an opportunity to reply in their supplemental memorandum. Fourth, under Louisiana law, statutes and regulations that authorize civil penalties are to be strictly construed. *See Gibbs Construction Co. v. Department of Labor,* 540 So.2d 268, 269 (La.1989).

## B. *Section 8(b)(1)*

■ Plaintiff Jane Doe argues that she has standing to attack section 8(b)(1) because the complaint states that she "may apply for employment with the City." The Court disagrees. This plaintiff does not state that she is actually seeking or intending to seek such employment, nor does she identify to which particular position or positions she "may apply" (e.g., whether she may apply to a "Category II ... safety sensitive position," the employees in which position the plaintiffs have excluded from their proposed class). Just as persons who seek to attack putatively illegal conduct on the ground that they may be subject to such conduct in the future lack standing to assert their civil rights claims, so too does this plaintiff. *See Lyons; O'Shea. Compare United Public Workers v. Mitchell,* 330 U.S. 75, 89–90, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947) (persons asserting a "generality of objection" lacked standing to at-

tack the Hatch Act) *with Clements v. Fashing,* 457 U.S. 957, 962, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982) (persons who alleged that, but for a state statute, they would run for specific higher state offices had standing to attack that statute). *Contrast Hernandez v. Cremer,* 913 F.2d 230, 233–37 (5th Cir.1990) (holding that a plaintiff who had been wrongfully excluded from reentry into the United States under an INS policy and who stated he wished to exercise his right of international travel in the future had standing to seek to enjoin future enforcement of that policy), *reh'g en banc denied mem.,* 925 F.2d 1461 (5th Cir. 1991).

■ Plaintiffs Joe Roe, Bill Doe, and Lawrence Warner assert that they have standing to attack this section because they will be "probationary" employees subject to testing under this section "if [they] seek promotions or lateral transfers within city government." On the one hand, the complaint states that all three of these plaintiffs are currently "permanent" (i.e., nonprobationary) City employees. On the other hand, the complaint does not allege that any of these three plaintiffs intends to seek or is eligible for a promotion or lateral transfer of any kind. Thus, their assertion fails for similar reasons.

Even if these three plaintiffs did allege that they intended to seek promotions or lateral transfers, however, their attack under this section would fail on the merits. The section does not purport to apply, and does not apply, to promotions or lateral transfers. The section applies only to employment applicants, whether for "sensitive" or any other position, and to probationary employees who have not yet become permanent City employees.

## C. *Section 8(b)(2)*

Because plaintiff Jane Doe lacks standing to attack section 8(b)(1), she necessarily lacks standing to attack this and the remaining sections below, which apply only to City employees.

■ The other three plaintiffs, while they are City employees, fare no better. None of these plaintiffs alleges to have

ever suffered any injury, "accident, near-miss or incident," whether on the job or otherwise. Nor has any alleged any likelihood of suffering such in the future. To presume that one of these three might suffer such an incident would be speculation. In sum, these three cannot show that they are "immediately in danger of sustaining some direct injury" from any testing under this section.

### D. Sections 8(b)(5) and 8(b)(6)

Section 8(b)(5) applies only to "employees with probationary status or employees in 'safety sensitive' positions." Section 8(b)(6) applies only to "employees in 'safety-sensitive' positions."

The claims as to "employees with probationary status" fail for the reasons indicated above for section 8(b)(1).

■ Further, none of the three City employee plaintiffs allege to be classified as holding a "safety sensitive" or "security sensitive" position within the meaning of these two sections. *Compare, e.g.,* Defendants' Memorandum at 3 *with* Plaintiffs' Supplemental Memorandum at 3.

■ While the Civil Service Commission's original substance abuse policy may have categorized building inspectors and data entry operators as "safety or security sensitive" employees subject to random drug testing, the Civil Service Commission permanently changed its policy (before not only the filing of the instant motion, but also before the filing of the first-amended complaint), among other things, to eliminate building inspectors and data entry operators from this group. Thus, while the City employee plaintiffs might have once had standing to attack the random testing under these two sections, any such claims, which are only for declaratory and injunctive relief, became moot. *See Rocky v. King,* 900 F.2d 864 (5th Cir.1990); *cf. Kremens v. Bartley,* 431 U.S. 119, 130, 97 S.Ct. 1709, 1715, 52 L.Ed.2d 184 (1977) (on class-action standing and mootness after material changes in a regulation under attack).

### E. Section 8(b)(7)

■ This section applies only to City employees who are "drivers of commercial motor vehicles operating in interstate/intrastate commerce." As with sections 8(b)(5) and 8(b)(6), none of the plaintiffs alleges to be such a driver.

### F. Section 8(b)(8)(a)

■ As with section 8(b)(2), none of the plaintiffs can show that he or she is "immediately in danger" of being tested *by reason of* a "return[ ] to work from a long illness, disabling injury, extended absence, reduction in force, or as a result of a condition of reinstatement upon completion of a reasonable drug and alcohol treatment or counseling program." It bears emphasizing that none of the plaintiffs alleges to have suffered, be suffering, or likely suffer any illness or injury; to have taken, be taking, or likely take an extended absence; to have been, be, or likely be placed on "reduction in force" or in a drug or alcohol treatment or counseling program.

### G. Section 8(b)(8)(b)

■ Like section 8(b)(6), this section applies only to City employees holding "safety/sensitive positions." This section is further restricted to those safety positions "whose activities are regulated by either the United States Department of Transportation's guidelines or the Louisiana Department of Public Safety." Again, none of the plaintiffs alleges to be such an employee.

### H. Section 10

This section merely provides what actions the City may take against a person who does not comply with the Policies. While the first sentence of section 10(a), if read alone, might imply that it constitutes drug-search authorization wholly independent of the enumerated provisions in sections 8(a)–(b), a reading of the entirety of section 10 reveals the contrary. Section 10 does not authorize searches that are not authorized by one or more of the provisions in sections 8(a)–(b); instead, section 10 merely sets forth what disciplinary actions

may be taken as a result of the search procedures undertaken pursuant to sections 8(a)–(b).

 To the narrow extent the plaintiffs are complaining that section 10 lacks adequate due process procedures to avoid "a substantial risk" that an employee may be wrongfully fired by reason of false test results, again the plaintiffs lack standing. The Court would have to assume not only that the plaintiffs would be tested, and not only that both the initial immunoassay-type test and the follow-up GC/MS test would be found positive for drug use by a trained medical review officer, but also that these tests—which mimic federal testing procedures that the Supreme Court has noted are "highly accurate," *see Von Raab*, 489 U.S. at 672 n. 2, 109 S.Ct. at 1394 n. 2—would in fact be false. Article III standing does not stretch so far. *Cf. O'Shea; Lyons.* This is especially so where as here no past false tests are alleged. *Cf. Blum*, 457 U.S. at 1001–02, 102 S.Ct. at 2784–85.

### III.

While the Court rules against the plaintiffs, the Court does not find that their complaint was frivolous, unreasonable, or without foundation. Thus, the Court does not award attorney's fees to the defendants under 42 U.S.C. § 1988. *See Coats v. Pierre*, 890 F.2d 728, 733 (5th Cir.1989), *cert. denied,* — U.S. —, 111 S.Ct. 70, 112 L.Ed.2d 44 (1990). *See generally Hughes v. Rowe*, 449 U.S. 5, 14–15, 101 S.Ct. 173, 178–79, 66 L.Ed.2d 163 (1980) (per curiam) (adopting for § 1983 cases the Title VII standard enunciated in *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 417, 98 S.Ct. 694, 698, 54 L.Ed.2d 648 (1978)). Under F.R.Civ.P. 54(d), however, the plaintiffs should bear all costs. *See Finkelstein v. Barthelemy*, 678 F.Supp. 1255, 1267 n. 81 (E.D.La.1988) (citing *Jones*

**2.** Because the Court dismisses this action on other grounds, it does not decide whether a plaintiff may sue in complete anonymity not only to the general public but also to both the defendants and the Court. *Cf. Doe v. Stegall,* 653 F.2d 180 (5th Cir. Unit A), *reh'g en banc*

*v. City of San Antonio*, 568 F.2d 1224, 1226 (5th Cir.1978)).

### IV.

For these reasons,[2] the Court denies class certification and dismisses the plaintiffs' entire complaint at their costs.

*denied mem.,* 659 F.2d 1075 (5th Cir. Unit A 1981). Nor does it decide whether others might assert a more specific attack on the Policies. *Cf. National Treasury Employees Union v. Bush,* 891 F.2d 99 (5th Cir.1989).